750 So.2d 1130 (1999)
Frederick J. RAPP
v.
CITY OF NEW ORLEANS.
Ronald E. Barre'
v.
City of New Orleans.
Nolan J. Exsterstein
v.
City of New Orleans.
John Burkart
v.
City of New Orleans.
James G. Clement
v.
City of New Orleans.
Robert J. Comeaux
v.
City of New Orleans.
Joseph Cosentino, Sr.
v.
City of New Orleans.
Fred Drovant
v.
City of New Orleans.
Francis Fatherree
v.
City of New Orleans.
Gerald P. Gervais
v.
City of New Orleans.
Willie L. Johnson, Jr.
v.
City of New Orleans.
Merrill J. Juneau
v.
City of New Orleans.
William Kerner
v.
City of New Orleans
v.
City of New Orleans.
Charles Sanders
v.
City of New Orleans.
Joseph Bruscato
v.
City of New Orleans.
Donald A. Brown
v.
City of New Orleans.
Nos. 98-CA-1714 to 98-CA-1730.
Court of Appeal of Louisiana, Fourth Circuit.
December 29, 1999.
Writ Denied April 7, 2000.
*1131 *1132 *1133 *1134 Robert H. Urann, William K. Hawkins, Robein, Urann & Lurye, Metairie, Louisiana, Attorneys for Plaintiffs/Appellees.
Avis Marie Russell, City Attorney, Milton Osborne, Jr., Deputy City Attorney, New Orleans, Louisiana, and James A. Babst, Lamothe & Hamilton, PLC, New Orleans, Louisiana, Attorneys for Defendant/Appellee.
(Court composed of Chief Judge ROBERT J. KLEES, Judge CHARLES R. JONES and Judge DENNIS R. BAGNERIS, Sr.)
*1135 JONES, Judge.
Defendant/appellant, the City of New Orleans (City), appeals the judgment of the Worker's Compensation Judge (WCJ) granting supplemental earnings benefits, disability benefits, medical expenses, penalties, attorney fees, and interest and costs to seventeen injured employees of the New Orleans Fire Department. After reviewing the record, we affirm.

FACTS
The Claimants[1], former members of the New Fire Department, filed individual claims against the City in the Office of Worker's Compensation. These claims were subsequently consolidated by the WCJ pursuant to LSA-C.C.P. art. 1561. The Claimants allege in their complaints that the City placed an offset against their disability retirement pensions once they began receiving worker's compensation benefits. Additionally, the Claimants allege that once their claims were filed, the City terminated medical benefits on all seventeen Claimants.
The City was served with a copy of the claimant's petition on April 12, 1993, but an answer to the petition was not filed until February 9, 1994, when the Claimants filed their Motion for Preliminary Default. The Claimants then filed a Motion for Summary Judgment, which was granted by the trial court. The trial court, using the Supreme Court's decision in Cousins v. City of New Orleans, 608 So.2d 978 (La.1992), reasoned that the Claimants, except for Merrill Juneau and Willie Johnson, were entitled to compensation and medical benefits. The WCJ also awarded the maximum amount for supplemental earnings benefits (SEB), medical benefits and a twelve percent (12%) penalty on all outstanding sums, costs and expenses, together with judicial interest and attorney's fees of $70,000.
Additionally, the WCJ held a trial on the issue of the improper offsets, and determined that the City improperly placed an offset on all of the Claimants' disability retirement pensions except that of Merrill Juneau. The WCJ concluded that the City did not conduct a proper investigation of the Claimants' files, nor did the City have any basis to terminate the Claimants' medical benefits. Moreover, the WCJ characterized the City's actions as arbitrary and capricious in light of the information presented by the Claimants during trial. Thus, the WCJ increased the Claimants' award for attorney's fees to $100,000.
On January 19, 1995, the City took a suspensive appeal to this Court; the Claimants answered the appeal seeking additional attorney's fees, interests and costs. This Court affirmed the judgment of the WCJ on the Motion for Summary Judgment for three of the original Claimants. However, the cases for the remaining seventeen Claimants were remanded to the worker's compensation court in order for the WCJ to determine whether these Claimants were eligible for SEBS. Further, the WCJ was ordered by this Court on the remand to determine whether the City's actions with regard to these remaining Claimants were arbitrary and capricious. See Rapp v. City of New Orleans, 95-1638 (La.App. 4 Cir. 9/18/96), 681 So.2d 433, writ denied 96-2925 (La.1/24/97), 686 So.2d 868.
Following the remand, the WCJ held a three-day trial in June 1997 on the issues outlined in the first appeal, and concluded that all seventeen of the Claimants made a prima facie showing of their entitlement to SEB and medical benefits. Nevertheless, the WCJ recessed the trial proceeding for two additional months in order to allow the City "every possible opportunity to present its case." Following the recess and an additional trial, the WCJ concluded that the City failed to pay any of the Claimants' outstanding medical expenses or to verify any of these expenses with the Claimants' *1136 treating physicians. The WCJ further found the actions of the City's counsel to be "reckless" and suitable for sanctions. On January 21, 1998, the WCJ issued a judgment awarding the Claimants (except Barre) disability benefits, medical benefits, penalties, attorney fees, interest and costs.[2] The WCJ also assigned reasons for judgment. From this judgment, the City took another suspensive appeal, and the Claimants answered the appeal seeking additional attorney fees.

ISSUES ON REMAND
In its first assignment of error, the City argues that the WCJ erred in refusing to re-open the claims in their entirety on remand. Specifically, the City claims that the WCJ erred by concluding, without further information, that the Claimants sustained compensable disabling injuries in the course and scope of their employment.
The Claimants, on the other hand, argue that this Court has clearly indicated in its previous decree that they have adequately satisfied their burden of showing that the injuries they sustained were work-related injuries. The Claimants argue that the remand only encompassed issues regarding the Claimants' post-injury earning capacity, their weekly disability rate, and whether the City acted arbitrarily and capriciously in the investigation. Thus, the Claimants argue that the issue of whether they suffered a work-related injury became final once our Supreme Court denied the City's writ application.[3] We agree.
The "law of the case" principle embodies the rule that an appellate court will not reconsider its own rulings of law in the same case; however, the doctrine is discretionary and is not applicable in cases of palpable error or when, if the law of the case were applied, manifest injustice would occur. Lejano v. Bandak, 97-0388 (La.12/12/97), 705 So.2d 158, 170. The error complained of must be readily apparent from the record, otherwise the previous decision will be upheld. Id.
In the case sub judice, the only argument offered by the City to rebut the findings of the WCJ was that the Claimants' testimony concerning their injuries while in the course and scope of their employment with the New Orleans Fire Department lacked credibility. Further, the City did not include in its brief any material facts to suggest that the Claimants' injuries did not occur in the course and scope of their employment. Moreover, the City's argument ignores the fact that these Claimants have been receiving benefits, from which the City has taken an offset, for a number of years. Therefore, we find that the payment of benefits is an acknowledgment that the Claimants were injured during the course and scope of their employment. Further, we note that it is extremely unlikely that the City would have paid any benefits to these Claimants had there been a question as to whether the injuries complained of were sustained in any other manner other than in the course of their employment.
When there exists a factual conflict in the record regarding a material fact, the trier of fact retains the discretion to decide that issue so long as that decision is reasonable. Coscino v. La. State Boxing and Wrestling, 97-2733 (La.App. 4 Cir. 9/9/98), 718 So.2d 1016. Thus, merely claiming that the accounts of the injuries are unreliable, without more, is insufficient to establish reversible error. Thus, we find no error in the WCJ's decision not to re-open the issue of whether the Claimants sustained work-related injuries.

PRESCRIPTION
In its third assignment of error, the City argues that the WCJ erred by holding that the three-year prescriptive period as outlined in LSA R.S. 23:1209(A) does not *1137 apply to claims which have been subject to an improper offset. More specifically, the City argues that the claims for improper offset of SEB's are time-barred because three years have passed since it placed an offset against the worker's compensation benefits for Robert Comeaux, one of the remanded claimants. The City further argues that the WCJ's award of benefits to Mr. Comeaux is also barred by peremption.
The Claimants argue that the City improperly characterized the right to take an "offset" as a "termination" of worker's compensation benefits. By interpreting an offset as a termination of benefits, the City argues that the three-year prescriptive period was activated. LSA-R.S. 23:1225 permits the reduction of benefits when the aggregate remuneration from sources specified in the statute exceeds 66 2/3 of the claimant's average weekly wages. However, the right to reduce benefits because the claimant is receiving other statutorily identified benefits is not equivalent to a termination of the benefits. In essence, the Claimants argue that the City's right to an offset is premised on the fact that it recognizes the Claimants' entitlement to worker's compensation benefits. Therefore, the Claimants argue that the City's consistent use of its offset rights was sufficient to interrupt prescription. We agree.
In cases where the employer began making payments of medical benefits pursuant to LSA-R.S. 23:1203, the employee's claim for medical benefits is forever barred unless the employee files a claim for benefits within three years of the date the last payment was made. See also Bledsoe v. Willowdale Country Club, 94-234 (La.App. 5 Cir. 9/27/94), 643 So.2d 1302, 1305.
This Court, in Rapp, briefly addressed the issue of prescription, but we remanded this issue to the WCJ pursuant to LSA-C.C.P. art. 2163 because the City filed its Peremptory Exception in this Court rather than in the worker's compensation court. Notwithstanding our decision to decline ruling on the issue of prescription, this Court found that there is a distinction between an offset of benefits and a termination of benefits.
A termination of benefits ordinarily would indicate that the employer had made the determination that the employee had no right of recovery, or that the employer refused to pay benefits regardless of that right. On the other hand, implicit in the offset is an acknowledgment that benefits are in fact due the employee, but the employer is entitled to credit for payments the employee receives from certain statutorily designated collateral sources. Therefore, the exercise of the right of offset is a tacit acknowledgment of an entitlement to benefits that continues as long as the offset continues.

Id. at 456. (Emphasis added). This Court further found that as long as the offset persists, "this continuing acknowledgment is sufficient to interrupt prescription on the employee's underlying claim for benefits." Id. This rule has been upheld by this Court in Palisi v. City of New Orleans Fire Dept., 95-1455 (La.App. 4 Cir. 3/12/97), 690 So.2d 1018, 1034, writ denied 97-0953 (La.6/20/97), 695 So.2d 1352.
In the instant case, the WCJ found that Mr. Comeaux was injured on November 1, 1988, and began receiving his pension benefits on January 17, 1989. The City started exercising its right to offset Mr. Comeaux's worker's compensation benefits on October 15, 1989. The record reflects that Mr. Comeaux had a number of medical problems unrelated to his injury in November 1989, which included a crushed ankle (December 1991), and a cancerous tumor in his throat (January 1992). Nevertheless, Mr. Comeaux remained in the work force by working as a park ranger with City Park (1992-1994) and the Tchefuncta Country Club (1997 to present). The City did not present any evidence to suggest that Mr. Comeaux was receiving at least 90% of his pre-injury wage, nor did the City present any evidence to suggest that Mr. Comeaux refused *1138 suitable jobs within his geographical area, which paid 90% of his pre-injury wage. The WCJ also determined that the City failed to offer Mr. Comeaux vocational rehabilitation in light of his limited educational background.
Additionally, the City failed to produce the documents from its worker's compensation carrier, which would show when an offset had been initiated against Mr. Comeaux's benefits within the three-year prescriptive period. According to the record, Claimant's counsel requested these documents well in advance of trial; yet, the City's only response was that it was unfamiliar with the request for the Rosenbush documents.
Whenever a litigant fails to produce available evidence and no reasonable explanation is made as to why such evidence was not produced, there is a presumption that such evidence would be unfavorable. Williams v. Golden, 95-2712 (La.App. 4 Cir. 7/23/97), 699 So.2d 102, writ denied 97-2788 (La.1/30/98), 709 So.2d 708. The reviewing court that implements the adverse inference must be guided toward the goal of a fair and equitable judicial process, by the likelihood that the verdict be based on the truth, and by the need to deter the wrongful intentional spoliation of evidence in the future. Id; see also Kammerer v. Sewerage and Water Board of New Orleans, 93-1232 (La.App. 4 Cir. 3/15/94), 633 So.2d 1357, writ denied 94-0948 (La.7/1/94), 639 So.2d 1163. Therefore, we find the City's argument that prescription ran against Mr. Comeaux's claim for benefits to be inconclusive given the City's failure to produce the requested evidence which would show when an offset was authorized against Mr. Comeaux' s worker's compensation benefits.

FALSE STATEMENTS
In its fourth assignment of error, the City argues that under La. R.S. 23:1208, Donald Brown, Ronald Barre, Fred Drouant, and Francis Fatheree should be barred from collecting any compensation benefits because their testimony was not credible and the documentation that was admitted into evidence at trial was either deceptive or misleading. The City cites Sumrall v. Luhr Bros., 95-0779, at 5 (La.App. 1 Cir. 12/15/95), 665 So.2d 796, 799 writ denied, 96-0187 (La.3/15/96), 669 So.2d 425 as authority for their contention.[4]

Donald Brown
The City argues that Mr. Brown stated in his income tax returns that he was "retired" and did not earn any income for 1987, 1988 and 1990; however, the signed affidavits that he sent to the City's worker's comp carrier indicated that he did earn income for those years. The City also argues that Mr. Brown was untruthful with regards to how he and his wife managed rental income derived from his wife's apartment complex.

Francis Fatheree
The City argues that Mr. Fatheree identified himself as being "retired" for approximately ten years, and did not earn any income during that period. However, the City argues that Mr. Fatheree and his wife own a flea market shop from which Mr. Fatheree and his wife have earned income. Yet, the City argues that the income from this business was not reported. In fact, the City argues that Mr. Fatheree and his wife hired a minimum wage worker to work in Mr. Fatheree's place when he was absent. Thus, the City argues that Mr. Fatheree's benefits should be forfeited as a result of the false statements he made on his financial records.

Ronald Barre
As it relates to Mr. Barre, the City argues that Mr. Barre had a pending personal injury claim against State Farm Insurance Company for an automobile accident, which occurred in Jefferson *1139 Parish. The City also argues that Mr. Barre failed to report this information to the City during its investigation of Mr. Barre's claim. Further, the City offered Mr. Barre's income tax returns into evidence, which showed that Mr. Barre did receive income from picking shrimp and crawfish following his accident with the fire department. Thus, the City argues that Mr. Barre's claim for benefits should be forfeited.

Fred Drouant
The City argues that Mr. Drouant made several misstatements regarding his post-injury income, namely that he classified himself as "retired," and he failed to indicate on his tax returns that he received income from several odd jobs following his injury with the New Orleans Fire Department. The City also argues that Mr. Drouant filed a Chapter 7 Bankruptcy and it requested that the WCJ listen to the cassette tapes that were recorded during Mr. Drouant's 341 Meeting with the U.S. Trustee. The City argued that the tapes would show that Mr. Drouant classified himself as "retired," and that he did not have any income for 1991.[5]
In rebuttal, the Claimants argue that the City's request for the Claimants benefits to be forfeited due to some alleged false statements given during trial is outside the scope of the remand from this Court. The Claimants also argue that the issue of penalizing the Claimants for alleged false statements was not raised at the trial level. In addition, the Claimants argue that once the WCJ allowed the City to cross-examine the Claimants concerning their alleged false statements, the WCJ dismissed the City's request to have the benefits forfeited. Finally, the Claimants also argue that the City failed to produce any evidence to suggest that any of the alleged misrepresentations were material, willful, or made with the intent to defraud the worker's compensation system. We agree.
In Trapani v. Domino Sugars, 95-2529 (La.App. 4 Cir. 6/5/96), 675 So.2d 1211, this Court stated that LSA-R.S. 23:1208 was clear and unambiguous, and that its purpose was to prevent and discourage fraud within the worker's compensation system. Moreover, the Supreme Court opined that the Louisiana legislature intended to forfeit any benefits to Claimants who made any false statements or misrepresentations for the purpose of obtaining benefits. See Resweber v. Haroil Const. Co., 94-2708 (La.9/5/95), 660 So.2d 7, 12. Therefore, once it has been determined that a false statement or representation has been made, the hearing officer must make a factual determination as to whether, based on the record, the statement or representation was willfully made "specifically to obtain benefits, and thus to defraud the workers' compensation system[.]" Sumrall, 665 So.2d at 799.
The parties who request that the benefits be forfeited must show that the employee's statements were not only false, but they must also show that the statements were willful and deliberately done with the intent to obtain benefits. LeBlanc v. Grand Isle Shipyard, Inc., 95-2452 (La.App. 1 Cir. 6/28/96), 676 So.2d 1157. Additionally, the party requesting that the benefits be forfeited must allege more than inconsistent statements by the claimant to meet his burden. Jones v. Trendsetter Production Co., Inc., 97-299 (La.App. 3 Cir. 2/25/98), 707 So.2d 1341, writ denied 98-0793 (La.5/15/98), 719 So.2d 463. More importantly, the alleged false statements must relate to a significant part of the claimant's request for worker's compensation benefits. Id; see also Beddes v. Qwik Pantry, 29,657 (La.App. 2 Cir. 6/18/97), 697 So.2d 695.
In the case sub judice, the WCJ found that Mr. Barre, Mr. Drouant, Mr. Fatheree and Mr. Brown were each entitled to supplemental earning benefits despite the *1140 City's allegations that these Claimants attempted to defraud the worker's compensation system. Each of the four Claimants testified that they did not report income from their part-time employment to the City because their meager income fell below the federal income requirements. Moreover, the Claimants testified that they classified themselves as "retired" because they were no longer receiving income as New Orleans firemen. Thus, they considered themselves "retired firefighters." The WCJ found the Claimants' testimony to be credible and awarded them SEBs. We also note that the City failed to support its allegation that these Claimants had defrauded the worker's compensation court with their testimony concerning their income. Further, the City did not conduct any formal discovery or present any evidence at trial to suggest that these Claimants earned more income than was reported on their financial records. In workers' compensation cases, the fact finder determines whether a particular burden has or has not been satisfied, a fact has or has not been proven, and whether benefits should or should not be awarded; and the court's conclusion will not be overturned if it is reasonably supported by the record. See Matthews v. Taylor Temporary, Inc., 97-1718 (La.App. 4 Cir. 2/11/98), 707 So.2d 1021. Accordingly, we find that the WCJ did not err in refusing to order forfeiture of the Claimants' benefits under La.R.S. 23:1208.

ENTITLEMENT TO SUPPLEMENTAL EARNINGS BENEFITS
In this assignment of error, the City argues that nine of the remanded Claimants failed to establish a prima facie case showing that they were entitled to SEBs. More specifically, the City argues that a mere listing of the Claimants' educational background and work experience, without more, is insufficient to show his eligibility for SEBs. The City also argues that the Claimants did not conduct a continuous search for employment. Rather, the City argues that their search for employment was limited to a few minimum-wage jobs, which would qualify them for SEBs.
The Claimants assert that they were not voluntarily underemployed as the City contends. On the contrary, the Claimants argue that it was the City's responsibility to prove that they either refused suitable employment or that their physical capabilities did not prevent them from obtaining employment, which paid at least 90% of their pre-injury wage. Further, the Claimants argue that the City, once again, did not produce any evidence to suggest that there were suitable jobs available to them in their geographical area that paid comparable wages to the former jobs. Additionally, they argue that the City did not produce any evidence of the Claimants' earning capacity. We agree.
The manifest error or clearly wrong standard of review is to be applied in all workers' compensation cases. Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129. Workers' compensation laws are to be liberally construed in favor of coverage; however, the claimant bears the burden of showing that his work-related accident resulted in his inability to earn at least 90% percent of pre-injury wages. Id; see also McDonnell v. Nestle Beverage Co., 97-2029 (La.App. 4 Cir. 4/22/98), 714 So.2d 757. Once the employee has proven his entitlement to SEBs, the employer who wishes to defeat the award of SEBs must show that the claimant is physically able to perform a certain job, and that job was offered to claimant or available to him in his employer's reasonable geographic location. Mistrot v. York Intern., 97-2374 (La.App. 4 Cir. 4/22/98), 712 So.2d 968. (Emphasis ours). More importantly, the fact finder's determinations as to whether the claimant has discharged his burden of proof regarding his alleged disability are factual determinations not to be disturbed on review unless clearly wrong or manifestly erroneous. Fontenette v. McDermott, Inc., 95-0190 (La.App. 1 Cir. 10/6/95), 694 So.2d 266.
*1141 In Rareshide v. Mobil Oil Corp., 97-1376 (La.App. 4 Cir. 4/22/98), 719 So.2d 494, writ denied 98-1595 (La.10/9/98), 726 So.2d 28, we found that the claimant was entitled to supplemental earnings benefits once we determined that the medical and lay testimony supported the fact that his work-related injury prevented him from returning to his previous job at an oil refinery. The claimant did not have any discernable skills, and his employer failed to establish that there was a suitable job available to him, which paid at least 90% of his pre-injury wage. See also LSA-R.S. 23:1221(3).
Uncontradicted evidence of the claimant's limited education, coupled with his disabling work-related injury, is sufficient to support the claimant's request for SEBs. Palisi, supra. Moreover, the award of SEBs will be upheld where the court finds that the claimant did not withdraw from the workforce and the employer did not produce any documents showing that the claimant had retired. Id.
Having previously determined in our decree that the remanded Claimants suffered a work-related injury, we now turn to consider if the evidence regarding the Claimants' educational and training background, along with their ability to find employment paying at least 90% of the pre-injury wage, will support the court's award of SEBs.[6] The record reveals the following information concerning the Claimants' educational and training background, and their ability to secure employment with a salary of 90% or more of his pre-injury wage:

Ronald Barre
Mr. Barre received his GED in 1962, and took fire suppression courses at Delgado Community College. Mr. Barre's work experience included various manual labor positions. He was initially with the U.S. Navy for two years and the remainder of his work history has been with the New Orleans Fire Department. Mr. Barre does not have any typing or computer skills, and the only employment he has had since his work-related injury has been odd jobs, which include driving boats and gathering crawfish and shrimp. His income for the years he worked ranged from $500 to $2,000 per year. The City has not offered Mr. Barre vocational rehabilitation or assistance locating employment since his injury with the New Orleans Fire Department. The WCJ found no merit to the City's argument that Mr. Barre had retired and was therefore not entitled to SEBs.

Donald Brown
Mr. Brown obtained his high school diploma in 1954, completed two years of college, and spent two years in the U.S. Army. During his tenure as a firefighter with the New Orleans Fire Department, Mr. Brown worked part-time in the sales department at Colgate-Palmolive. Following Mr. Brown's injury, he returned to the sales department at Colgate-Palmolive on a commission basis from 1986 to the present. As a result of his employment with Colgate-Palmolive, Mr. Brown's salary ranged from $5,000 to $12,000 per year, which is significantly below 90% of his preinjury wage. Nevertheless, Mr. Brown's monthly earning statements and affidavits to the City stated that he did not earn any income following his accident. Though the WCJ found Mr. Brown's financial documents to be misleading, it awarded SEBs to Mr. Brown because his explanation regarding the discrepancy was credible, and the City failed to produce any contrary evidence.

James Clement
Mr. Clement received his high school diploma in 1959, and took several fire suppression courses at Delgado Community College. He joined the New Orleans Fire *1142 Department in 1962, and spent a short time in manual labor positions before enrolling in the U.S. Marine Corps for five and half months. Following his work-related injury with the NOFD, Mr. Clement began working in 1993 to the present in a sales position merchandising grocery stores with paper products. The record reflects that he earned approximately $8,000 per year in this position. Mr. Clement has no computer or typing skills, and the WCJ concluded that he was unable to secure employment earning 90% or more of his pre-injury wage.

Robert Comeaux
Mr. Comeaux received his high school diploma in 1960, but there was no indication in the record that Mr. Comeaux possessed any transferable skills outside of his high school education. He worked two years in manual labor before joining the NOFD. Following his work-related injury, Mr. Comeaux began working as a ranger with City Park and then with the Tchefuncta Country Club earning minimum wage. The WCJ concluded that Mr. Comeaux was entitled to SEBs because Mr. Comeaux was unable to earn 90% of his pre-injury wage.

Francis Fatheree
Mr. Fatheree received his high school diploma in 1955, took several science courses at a junior college, and served three years in the U.S. Army. Mr. Fatheree also worked for a finance company and did some construction work through the Pipefitter's Union Hall prior to joining the fire department in 1967. Following his work-related injury, Mr. Fatheree began working at a flea market shop owned by his wife. He did not receive a salary from this position, and the revenue produced from sales was reinvested into the business. There was testimony that he and his wife hired a replacement worker at a rate of $5.00 per hour to fill in for him when he was absent.

Willie Johnson
Mr. Johnson earned his GED in 1964 while he was in the U.S. Navy. He took an English course at the University of New Orleans, fire depressions courses at Delagdo Community College, a course at East Jefferson Vocational School, which he did not complete, and a home-study course on watch repair. Mr. Johnson worked for several months as a laborer and a shoe salesman prior to joining the NOFD in 1968. Following his work-related injury, he worked briefly as a short-order cook and then as a bus driver. Due to his back pain, Mr. Johnson was able to only drive part-time. Though his annual income earnings ranged from $800 to $19,000, Mr. Johnson has not been able to locate employment, which pays 90% of his pre-injury wage. The record also indicated that Mr. Johnson was involved in an automobile accident in 1992; however, there was no evidence to suggest that this accident affected his back injury.

Merrill Juneau
Mr. Juneau received a high school education and took several Emergency Medical Technician (EMT) courses at the Elaine and Nunez Vocational School. Prior to joining the fire department in 1971, Mr. Juneau held a number of manual labor positions, and after 9 years with the fire department, Mr. Juneau worked as an EMT. Like firefighting, Mr. Juneau's position as an EMT was physically demanding and required him to lift 150 pounds or more on a daily basis. After his work-related injury, Mr. Juneau was unable to find employment as an EMT; therefore, he returned to the fire department as a supply technician.[7] Mr. Juneau was employed as a supply technician as of the date of trial. His current position with the fire department pays $7.08 per hour, well below his pre-injury wage. The record also reflects that Mr. Juneau has had some computer knowledge, but he does not have any typing skills.

*1143 William Kerner

Mr. Kerner received his high school diploma in 1953, and worked two years as an electrician's helper in the U.S. Army. Prior to joining the fire department in 1961, he drove cabs for 3 years and continued driving cabs on a part-time basis after joining NOFD. Following his work-related injury, Mr. Kerner was unable to locate employment due to his educational and physical limitations; therefore, he returned to driving cabs in 1994, and continued doing so as of the date of trial. He earns approximately $9,000 per year after expenses.
Mr. Kerner also holds a position with United Cab, Inc., which operates on a coop basis and allows an individual to own a maximum of 5 cabs. The position with United Cab is not a paid position. Additionally, Mr. Kerner formed his own corporation in 1996, entitled H.K., Inc. According to his 1996 corporate tax forms, Mr. Kerner incurred a loss of approximately $2,000.

W. Wayne Kerth
Mr. Kerth received a high school education, and took several fire suppression courses at Delgado Community College. Prior to joining the fire department, Mr. Kerth worked primarily as a warehouseman. During his tenure as a fireman, Mr. Kerth developed a hobby of collecting antique knives. Following his work-related injury, Mr. Kerth turned his hobby into a business, and he became an antique knife dealer. His new business venture required him to travel to 10 U.S. cities twice a year and present for sale a collection of his antique knives. After all of his travel and inventory costs had been deducted, Mr. Kerth earned a profit of $5,000.
The City did not provide vocational rehabilitation to any of these Claimants; there was no evidence presented to establish their earning capacity; and the City did not provide any information on jobs that were available to these Claimants prior to the WCJ's award of SEBs. Nevertheless, the City contested the award of SEBs solely on the basis of its belief that these Claimants were voluntarily underemployed or retired.[8] However, the WCJ rejected the City's arguments and concluded that the Claimants adequately articulated for the record that they were not voluntarily underemployed, but were actively seeking higher-paying employment.
We agree with the City's proposition that a claimant's testimony that he is no longer able to return to his pre-injury employment, without more, is insufficient to prove his entitlement of SEBs. See Rapp, 681 So.2d at 438. However, unlike the claimant in Hebert,[9] these Claimants decided not to remain unemployed, but were able to secure some forms of employment despite their limited educational and physical conditions. Further, they testified that they continued seeking other forms of employment despite not receiving any assistance from the City. Therefore, without any evidence from the City that *1144 these Claimants refused higher-paying jobs, we find that these Claimants have proven their entitlement to SEBs.

SOCIAL SECURITY OFFSET
In this assignment of error, the City argues that the WCJ erred in allowing the City to place an offset on Nolan Exterstein's Social Security benefits only up until February 1994, which is the date the City's interrogatories were mailed to the claimant requesting a listing of all benefits Mr. Exterstein received since his injury with the NOFD. The City argues that the offset should have been extended to July 1992, which is when Mr. Exterstein began receiving Social Security benefits.
In rebuttal, Mr. Exterstein argues that this issue is outside the scope of the remand from this Court. Further, Mr. Exterstein argues that the offset with regards to Social Security benefits can be applied when the claimant has been declared permanently and totally disabled. Notwithstanding the City's failure to establish that he is permanently and totally disabled, Mr. Exterstein argues that the City failed to make a judicial demand for the offset as outlined in Louisiana Ins. Guar. Ass'n v. Cloud, 627 So.2d 758 (La. App. 2 Cir.1993). We disagree.
LSA-R.S. 23:1225(C) provides:
(1) If an employee receives remuneration from:
* * * * * * * *
(b) Old-age insurance benefits received under Title II of the Social Security Act to the extent not funded by the employee.
* * * * * * * *
then compensation benefits under this Chapter shall be reduced, unless there is an agreement to the contrary between the employee and the employer liable for payment of the worker's compensation benefit, so that the aggregate remuneration from Subparagraphs (a) through (d) of this Paragraph shall not exceed sixty-six and two-thirds of his average weekly wage.
However, the employer's right to have the claimant's Social Security reduced must be contingent on the fact that the claimant is permanently and totally disabled. Lee v. M & O, Inc., 97-141 (La.App. 3 Cir. 6/11/97), 698 So.2d 6. No reduction of worker's compensation should be made for Social Security benefits paid on the basis of the claimant's attainment of a specified age as distinguished from Social Security benefits based on disability. See Fontenot v. Sunland Const. Co., Inc., 585 So.2d 607 (La.App. 3 Cir.1991), writ denied 589 So.2d 494 (La.1991).
In the instant case, Mr. Exsterstein, who was 60 years old on the date of trial, graduated from high school in 1955, and subsequently went into the U.S. Air Force as a technician instructor. While in the military, Mr. Exsterstein took several fire suppression courses at Delgado Community College, but he did not receive any typing or computer training. He later joined the New Orleans Fire Department in 1962. During his 27 years of service with the fire department, Mr. Exsterstein became a fire captain and sat on the Board of Directors for the New Orleans Federal Fireman's Credit Union. He also worked for Moisant Properties during his tenure with the fire department. While an employee with Moisant Properties, Mr. Exsterstein was required to move furniture for tenants who had been evicted.
Following his work-related injury, Mr. Exsterstein was unable to perform any heavy-duty work, and the jobs he applied for after his injury with the fire department were too strenuous for him to perform.[10] Mr. Exsterstein testified that he *1145 was unable to find employment that would pay him at least $250 per week. He also testified that he was experiencing pain in his neck and left knee on a daily basis. During Mr. Exsterstein's testimony, the WCJ noted that Mr. Exsterstein was exhibiting involuntary movements while on the witness stand, which the WCJ concluded, was the result of his work-related injury. Additionally, Mr. Exsterstein testified that his treating physician had recommended knee replacement surgery if his knee condition worsened. Mr. Exsterstein also testified that the City did not offer any vocational rehabilitation following his injuries, and that his injury with the fire department has made him unemployable.
Mr. Exsterstein further testified that he was involved in an automobile accident in 1991, whereby he received $15,000 in a personal-injury settlement.[11] Though the injuries he received in this automobile accident did aggravate his pre-existing work-related injury, the WCJ did not find that this accident interfered with his entitlement for SEBs. Moreover, Mr. Exsterstein testified that he has outstanding medical expenses totaling $8,696.04, which the City has refused to pay since 1993. He further testified that he has had to pay all of his prescription expenses because the City discontinued paying for his prescriptions when it terminated his workers' compensation benefits.
The WCJ concluded that Mr. Exsterstein's inability to work was directly related to his work-related injury with the fire department. The WCJ denied all allegations that Mr. Exsterstein had retired or that his testimony was less that credible. Accordingly, the WCJ awarded SEBs and outstanding medical expenses to the claimant. As to the outstanding medical expenses, the WCJ noted that the City did not produce any evidence that indicated that the medical expenses had been paid or that there was a reasonable explanation as to why the medical expenses were not paid.
Notwithstanding Mr. Exsterstein's entitlement to SEBs, the WCJ found that the City was entitled to an offset pursuant to LSA-R.S. 23:1225, subd. C because Mr. Exsterstein was permanently and totally disabled, and he was receiving Social Security disability benefits. Because Mr. Exsterstein did not disclose in his answer to the interrogatories that he was receiving Social Security disability benefits, the WCJ made the offset retroactive to February 1994, which is the time when the City propounded its interrogatories to the claimant.
The claimant's credibility is of primary importance in a worker's compensation case, and questions regarding whether the employee has satisfied his burden of proof and whether his testimony is credible are questions of fact that are subject to the manifest error/clearly wrong standard of review of review. Hickman v. City of New Orleans, 95-0210 (La.App. 4 Cir. 12/28/95), 666 So.2d 696, writ denied 96-0264 (La.4/19/96), 671 So.2d 927. Additionally, the issue of disability presents a legal, rather than purely medical question, which must be determined through consideration of both medical and lay testimony. Howell v. Service Merchandise Co. Inc., 95-79 (La.App. 3 Cir. 8/9/95), 663 So.2d 96.
In the instant case, Mr. Exsterstein argues that the City failed to establish that he was permanently and totally disabled, which is an element the City must prove to show that it is entitled to the offset. However, the record reflects that Mr. Exsterstein's treating physician placed a number of restrictions on the type of work he could do. The claimant was prohibited from lifting or pushing anything over 25 pounds; he could not stoop, bend, reach, climb, squat or work above eye *1146 level. The record also indicates that he would be considered for future knee-replacement surgery if his knee had worsened. Therefore, in light of the claimant's, age, education, work experiences and physical limitations, we find no error by the WCJ in allowing the City the right to enforce an offset on Mr. Exsterstein's worker's compensation benefits since the record indicates that the claimant is permanently and totally disabled.

OUTSTANDING MEDICAL EXPENSES
In this assignment of error, the City contends that the WCJ erred in awarding the Claimants outstanding medical expenses. The City argues that these medical expenses were incurred at the insistence of the Claimants' counsel and just prior to trial. Additionally, the City argues that the Claimants were not consistent in their doctor visits because they allowed several months to lapse between treatments.
The Claimants argue that they were forced to pay all of their outstanding medical expenses once the City terminated their medical benefits. They also argue that these medical expenses were directly related to their work-related injuries and were promptly submitted to the City for payment. Nevertheless, the City refused to pay these expenses. Moreover, they argue that the City refused to investigate their claims or require them to be examined by an Independent Medical Examiner before arbitrarily denying payment. Additionally, the Claimants argue that the City did not produce any affidavits, depositions or medical reports that would suggest that these medical expenses were fraudulent or deceptive. We agree.
It is incumbent upon the worker's compensation insurer to make a reasonable effort to ascertain the plaintiffs exact condition at the time which compensation benefits are terminated. Despain v. Guichard Drilling Co., 93-933 (La.App. 3 Cir. 3/2/94), 634 So.2d 1240. An injured employee's worker's compensation benefits may not be terminated based on inconclusive medical reports. Gordon v. Sandersons Farms, 96-1587 (La.App. 1 Cir. 5/9/97), 693 So.2d 1279. A unilateral reduction or termination of benefits by the employer is prohibited otherwise the reduction or termination is considered arbitrary and capricious. Rachal v. Crown Store Equipment Co., 93-1602 (La.App. 3 Cir. 6/1/94), 640 So.2d 730. (Emphasis added). The issue of whether the employer should be cast with penalties, costs and attorney's fees in a worker's compensation case is a question of fact subject to the manifest error/clearly wrong standard of review. Kirn v. East Jefferson Hosp., 96-0838 (La.App. 1 Cir. 2/14/97), 691 So.2d 127.
In the instant case, the Claimants presented sufficient evidence to support their claim for outstanding medical expenses. Each of the Claimants was diagnosed with compensable injuries, which required medical treatment. However, the City relentlessly argued that the Claimants should not be awarded medical benefits because they intentionally incurred these additional medical expenses in order to support their claims for worker's compensation benefits. However, the City did not present any evidence to suggest that the claims were exaggerated. Additionally, the record reflects that the WCJ allowed the City additional time before the August trial to investigate the Claimants' request for medical expenses.[12] Notwithstanding the WCJ's extension for discovery, the City failed to investigate the claims. Further, the City did not request the Claimants to be examined by its own Independent Medical Examiner.
The reviewing court must determine not whether the trier of fact was right or wrong, but whether the fact finder's conclusion *1147 was a reasonable one, after reviewing the record in its entirety. Miller v. City of New Orleans, 95-1005 (La.App. 4 Cir. 12/14/95), 665 So.2d 1293, 1297. After reviewing the evidence presented by the Claimants, we find that the WCJ was not clearly wrong or manifestly erroneous in granting the Claimants' request for outstanding medical expenses.

RETIRED CLAIMANTS
In this assignment of error, the City argues that the WCJ erred in concluding that Joseph Cosentino, Gerald Gervais, and John Burkhart had not retired, pursuant to LSA-R.S. 23:1221(3)(d)(iii). The City argues that these Claimants have either not worked for a substantial period of time or they have classified themselves as retired.
The Claimants argued that they have consistently worked since their work-related injuries and they have continued looking for higher-paying jobs notwithstanding their disabling injuries Thus, the Claimants argue that the WCJ was not clearly wrong in finding that they were not retired pursuant to LSA-R.S. 23:1221 et seq. We agree.
Again, we restate that a decision of the worker's compensation court is subject to the manifest error/clearly wrong standard of review because the trial court is in a better position to judge the credibility of the witnesses and to evaluate the evidence as it is being presented. Haynes v. Lee White Wrecker Service, 612 So.2d 944 (La. App. 4 Cir.1993).

Joseph Cosentino
The record indicates that Mr. Cosentino, age 64, completed his high school education at the age of 16 after entering the U.S. Air Force in 1949. He attended Sacramento Junior College for one year, and then entered the work force as a manual laborer. Mr. Cosentino joined the fire department in 1967, however he continued to perform several odd jobs on a part-time basis. The various types of work he performed included painting, roof repair and plumbing. Following his work-related injury, Mr. Cosentino tried to do manual work on a part-time basis; however, his disability made it very difficult for him to do this type of work because he did not have the full use of his right arm. He testified that he could not climb ladders, or raise his right arm above eye level. Nevertheless, Mr. Cosentino continued looking for employment in the classified ads. On the date of trial, Mr. Cosentino was working at Pepperidge Farm Distributors stocking shelves. Mr. Cosentino testified that he worked four to five hours a week and earned $25 per week or $5.00 per hour.

Gerald Gervais
Mr. Gervais received his GED in 1958 while he was enrolled in the U.S. Navy. Mr. Gervais was employed as a machinist mate for 3½ years in the U.S. Navy. He worked for the Merchant Marines as an oiler and as a third assistant for 4 years. After leaving the Merchant Marines, Mr. Gervais worked for American Cyanamid for 6 months before being laid off. In 1967, Mr. Gervais joined the fire department until he was injured in September 1987.[13]
Following his work-related injury, Mr. Gervais worked for a neighbor delivering newspapers for $8.00 per hour for two to three hours a week. He testified that this type of work was very sporadic. He applied for entry level positions at Boomstown Casino, Home Depot, Wal-Mart, Schwegmann's Supermarket, and American Cyanamid, but he was only able to find employment as a stagehand at the Ernest N. Morial Convention Center. This position *1148 paid him $10 per hour, and he worked at the Convention Center on an as-needed basis. Mr. Gervais does not have any typing or computer skills and he did not receive any assistance from the City in finding employment.

John Burkart
Mr. Burkart received his high school diploma in 1952. He worked as an office boy with Woodward Wright & Company for four years before joining the fire department in 1957. While with the fire department, Mr. Burkart took mandatory fire suppression courses at Delgado Community College. He later became District Chief with the fire department and served in this position for seven years. He also served as acting Chief for several years prior to leaving the department in 1989.
Following his work-related injury, Mr. Burkart obtained employment as a reserve deputy sheriff with the Orleans Parish Civil Sheriffs Office.[14] Though the reserve deputy position was a non-paying position, it did allow Mr. Burkart the flexibility he needed when the pain from the three-level herniation became too intense for him to work. Mr. Burkart testified that the Civil Sheriffs office had a position called a "keeper" which he applied for prior to trial. He testified that he is qualified to work in this capacity, but the position does not pay 90% of his pre-injury wages. Mr. Burkart testified that he looked for other entry-level positions in the newspaper advertisements, but those positions either require him to perform heavy manual labor or possess a higher educational background. Mr. Burkart further testified that he is computer literate, but he has limited typing skills.
It is clear from the record that these Claimants did not intend to withdraw from the workforce. There was no indication in the record that they arbitrarily decided to cease looking for employment or that they were conducting themselves as retirees. In Breaux, this Court found that the claimant had permanently retired from the workforce because he specifically testified, on two occasions, that he had retired and had no intentions of returning to the fire department. Moreover, the claimant in Breaux ignored his physician's recommendation for sedentary work when he stated that he had no intentions of looking for work.
Likewise, in Mason v. Auto Convoy, 27,444 (La.App. 2 Cir. 11/1/95), 662 So.2d 843, writ denied 95-2905 (La.2/2/96), 666 So.2d 1103, our brethren at the Second Circuit found that the claimant therein had retired based on his letter to his co-workers. In his letter, he stated that he was serving notice on them of his "impending retirement," and that he has informed the Teamsters Union that he wished to retire.
There is nothing in this record remotely similar to the claimant's actions in Breaux and Mason. In fact, all three of the Claimants in the instant case diligently sought and subsequently obtained employment despite receiving no assistance from the City. Further, these Claimants continued looking for higher-paying employment notwithstanding their physical and educational limitations. Accordingly, we find no error by the WCJ in determining that neither Joseph Cosentino, Gerald Gervais nor John Burkart had permanently retired from the workforce.

OFFSET PERCENTAGE
In this assignment of error, the City contends that the WCJ erred in allowing the City to only receive a 70.03% offset against the retirement benefits of William Kerner and Merrill Juneau. The City argues that because it is a major contributor to the two retirement plans for all firemen, it should have received a higher percentage rate, which would not be less than 80%. More specifically, the City argues that it should have been given an 88.33% offset on Mr. Kerner's retirement benefits because this Court previously authorized the City to take an offset in Rapp. The *1149 City further argues that it should have been granted a 99.44% offset against Mr. Juneau's retirement benefits because his contribution into the retirement fund was relatively small in comparison to the overall funding of the plan.
In rebuttal, the Claimants argue that the City did not provide the WCJ with the proportion the City funded for both retirement plans. Further, they argue that the offsets requested by the City for Mr. Kerner and Mr. Juneau are not appropriate because the City would be getting a credit for contributions and investments that were placed in the plans from other sources of funding (i.e. donations, trust assets, taxes etc.). As it relates to Mr. Kerner, Claimant's counsel argues that the City should not have been awarded an offset because it did not make any contributions into the plan Mr. Kerner was participating in. Therefore, the offset amount should have been zero.
As to Mr. Juneau, Claimants' counsel argues that though Mr. Juneau received a substantial amount of money from his retirement plan, he only received what he contributed to the plan and nothing more. Moreover, the Claimants argue that the City has not made any payments into his retirement since Mr. Juneau joined the fire department over twenty years ago. Therefore, they argue that the City should not be entitled to an offset against Mr. Juneau's benefits because it was not able to establish with any degree of certainty the proportion it contributed to these retirement funds.
According to the facts of this case, the New Orleans firemen contributed retirement income into one of two retirement plans. Employees, who were hired prior to January 1, 1968, invested into a benefits package, which is commonly referred to as the "old" plan. The old plan was not actuarially funded in advance. In other words, the calculations of firemen's benefits in this plan did not consider the extent of retirement payments to an individual employee based on life-expectancy figures. Also, the contributions made by the current employees under the old plan are not invested to cover future benefits. Therefore, the old plan was referred to as the pay-as-you-go plan. Additionally, the employer did not make any contributions in the old plan; thus, at the time the firemen become disabled there were no actual contributions from the City in the employee retirement plan.
Conversely, employees who were hired after January 1, 1968, invested in an actuarially determined defined benefit plan, which is known as the "new" plan. Under the new plan, both the employee and the employer contribute to the plan, and interest accumulates on these contributions from various outside sources. In the new plan, benefits paid to the employee are funded on an overall basis, meaning the benefits due to each individual employee was funded by the pool, not by funds accumulated, set aside, segregated or accounted for separately for that individual. See Palisi, 690 So.2d at 1042. More importantly, the court, in determining the offset percentage, must determine the funding of both the employee and the employer at the time of disability regardless of what retirement plan the employee in under. In the instant case, Mr. Kerner was under the old plan and Mr. Juneau was under the new plan prior to their departure from the fire department.
LSA-R.S. 23:1225(C)(1)(c) provides that the employer bears the burden of proving the credit to which it is entitled, and the offset percentage must be based on the proportion that is funded by the employer. See Matthews v. City of Alexandria, 619 So.2d 57 (La.1993). In Matthews, the Supreme Court found that the City of Alexandria had satisfied its burden of proof with respect to the offset of the claimants' worker's compensation benefits. The City presented a 10-year contribution table, which showed the amount of contributions made by the employer and the employees during the claimants' tenure as employees of the City of Alexandria. Therefore, the Supreme Court found that the City of *1150 Alexandria was entitled to an offset percentage of 74.52% based on the 10-year contribution table and because the claimants' did not present an alternative method of computing the offset percentage.
This Court has previously followed the reasoning in Matthews when we computed the employer's offset percentages in Palisi, supra. In Matthews, the Supreme Court calculated the employer's offset percentage by taking the total amount of contributions made by the City during the years of the claimant's employment and divided that amount by the total amount of contributions made by the City's and the employees during those years.
In the case sub judice, Mr. Michael Conefry, the City's expert witness and the actuary for the Employees' Retirement System for the City of New Orleans, described the method used by the City to calculate the specific disability benefits payable to each employee. He also described how the City's offset percentage was calculated under the new plan.
According to Mr. Conefry's method for calculating the employer's contribution under the new plan, he testified that the employee's accumulated contribution to the fund is increased by 7½ %. This percentage represents the accumulated interest the employee would have received had he placed his individual contribution into an annuity account. Mr. Conefry substantiated the percentage amount by testifying that the interest rate for most public sector plans is between seven and eight percent. Therefore, he testified that he used 7½ % because it is midline interest rate figure. Therefore, for purposes of our opinion, we refer to the employee's accumulated contributions plus interest as "A".
"A" is then multiplied by the number of months the employee has participated in the plan, which we shall refer to as "B". "C," which is the actuarial present value of original monthly benefits as of the date the pension benefits began, is calculated based upon the 1971 Group Annuity Mortality Table for individuals in the same age group as the employee in question. It is unclear from the record how Mr. Conefry arrived at this particular amount. However, he did testify that this figure is dependent on several variables, which includes the employee's age, his length of employment and his life expectancy.
"B" and "C" are then added to arrive at "D," which represents the total actuarial present value of monthly benefits or the aggregate amount that has been contributed to the plan by both the employee and the employer. Mr. Conefry then testified that the employee's percentage of contributions or "E" is achieved by dividing "D" into "B." Thus, subtracting "E" from 100% represents the employer's contribution.
While the WCJ noted that this was a very thorough method of computing the contributions for both the employee and employer, he declined to adopt Mr. Conefry's method. The WCJ reasoned that Mr. Conefry's calculation of the employee's monthly benefits could be altered by the premature death of the employee, which would change the amount of monthly disability benefits the employee would receive. We also decline to adopt this method of computing employer's contributions due to the uncertainty in the mortality figures. However, we find that calculations used in Palisi and Matthews would result in essentially the same amount provided that the employer who is seeking the offset would provide the WCJ with the employee's contribution to the overall retirement during the period of the employee's tenure.
In the instant case, the City provided the WCJ with the contributions made by the employees and the employer during the four-year period Mr. Juneau worked for the fire department. According to the City's records, the employees contributed approximately $122,205 to the retirement plan and the total amount contributed to the plan equaled $52,331,201. Accordingly, the employee's contributed.23% to the overall plan from 1987 to 1991 and the City contributed 99.97% to the plan. However, our calculations do not *1151 take into account the fact that Mr. Juneau entered the plan in April 1987, was injured in November 1990, and started receiving pension benefits in September 1991. Therefore, we note that Mr. Juneau did not participate in the plan for an entire four years. Hence, we amend the WCJ's offset percentage to reflect that the City be awarded a 99.44% offset against Mr. Juneau's benefits.
Notwithstanding the method used in Matthews and Palisi, Mr. Conefry testified that the old plan was partially funded by the employees, donations, taxes, etc. Furthermore, he testified that at the time of the employee's disability, the employer did not make any contributions into the plan. The City argues that it should be granted an 80% offset against Mr. Kerner's worker's compensation benefits because the City carried a heavy burden in funding the old plan once benefits commenced and that the 80% offset represents an accurate proportionate share of funding by the City.
This Court previously addressed this issue in Palisi, whereby we stated that all employees under the old plan are exempt under Cousins from the offset provided by LSA-R.S. 23:1225, subd. C(1)(c) because of the lack of funding by the employer. Nevertheless, we granted the City the right to offset the claimant's worker's compensation benefits on the premise that the City's lack of complete figures for the year in question was not a sufficient basis in which to deny the offset. Therefore, we granted the City a 70.03% offset in Palisi.
In the case sub judice, the City makes the exact same argument as it did in Palisi. However, we find Mr. Conefry's testimony more compelling in that he testified that the City did not make any contributions into the plan at the time of the employee's disability even though some monies had been contributed to the plan not including the employees' contribution. Therefore, we find no compelling reason to award a higher offset percentage to the City than what was used in Palisi, considering that the Claimants' years of employment in Palisi included the same years of employment for Mr. Kerner in this case. Accordingly, we find no error by the WCJ in awarding a 70.03% offset against Mr. Kerner's worker's compensation benefits.

EXCESSIVE ATTORNEY FEES AND PENALTIES
In this assignment of error, the City argues that the trial court erred in awarding attorney fees and penalties in favor of the Claimants because there was no evidence in the record to suggest that the City arbitrarily denied their claims. The City also argues that there was no evidence in the record regarding the number of hours that the Claimants' attorney spent in the prosecution of the case. Thus, the Claimants did not adequately establish a foundation for the award of attorney fees. Further, the City argues that the claims were denied because the Claimants' failed to show a causal link between their injuries and the outstanding medical expenses.
The Claimants, in rebuttal, argue that the penalties and attorney fees were properly awarded against the City since the City arbitrarily refused to pay their claims without a thorough investigation of the Claimants' medical conditions. The Claimants also argue that the City failed to conduct its own independent medical evaluation of the Claimants, and tried to discredit their medical conditions by referring the to the dates when they scheduled their doctor visits in relation to the time the trial commenced.
The assessment of attorneys' fees incurred in the prosecution and collection of the employee's claim is proper if the City was arbitrary, capricious or without probable cause in its termination of his compensation benefits. See LSA-R.S. 23:1201.2; see also Miller supra. These penalties are stricti juris and should be imposed only in those instances in which the facts negate probable cause for non-payment. Id. (Emphasis added). The assessment of penalties, however, would be improper if the employer has sufficient *1152 factual and medical evidence to counter information presented by the claimant. Brock v. Morton Goldberg Auction Galleries, Inc., 93-1078 (La.App. 4 Cir. 1/13/94), 631 So.2d 512 writ denied 94-0395 (La.4/4/94), 635 So.2d 1105. (Emphasis added). Further, the issue of whether penalties and attorney's fees should be awarded is a question of fact which shall not be disturbed unless manifestly erroneous or clearly wrong. Price v. City of New Orleans, 95-1851 (La.App. 4 Cir. 3/27/96), 672 So.2d 1045, writ denied 96-1016 (La.10/25/96), 681 So.2d 360.
In McGaughey v. City of New Orleans, 96-1331 (La.App. 4 Cir. 5/28/97), 695 So.2d 1109, this Court did not award penalties and attorney's fees against the employer in light of the fact that the employer had not received the necessary notice or medical evidence to show a connection between the alleged mental injury and the work-related injury. Further, there was evidence in the record to suggest that the claimant's psychiatric problems may not have stemmed from his work-related injury.
Unlike the claimant in McGaughey, the Claimants' herein did provide the City with timely notice of their intent to seek reimbursement of medical expenses. Further, the City did not conduct its own evaluation of the Claimants prior to denying their claims. Moreover, the record herein is saturated with instances where the City failed to present any evidence to support its denial of the Claimants' right to compensation. Accordingly, we find the WCJ's award of penalties and attorney's fees was not excessive in light of the arbitrary and capricious manner in which the City conducted its investigation of these claims.
The Claimants answered the appeal seeking additional attorney's fees for the costs and expenses in prosecuting these claims on remand. Though Claimants' counsel did endured long hours of litigation in the prosecution of these claims, we find that it was, however, his obligation to present all evidence necessary to make these Claimants eligible for SEBs. In Rapp, the evidence regarding the Claimants' education, training and ability to secure future employment paying at least 90% of his pre-injury wages was not complete. Therefore, this Court ordered the remand in an attempt to allow the Claimants an opportunity to supplement the record with information that would make them eligible for SEBs. Hence, we find that it would be inequitable for this Court to award additional compensation to Claimants' counsel for fulfilling or completing his contractual obligations to his clients.

FRIVOLOUS APPEAL
Claimants also request damages for having to defend themselves against the City's "frivolous" appeal. Although the appeal, in general, may not have had any merit, the reviewing court must find that the appellant either intended to delay execution of judgment by filing the appeal or that the appellant was not serious in the position he advocated before denying damages for a frivolous appeal. Elloie v. Anthony, 95-0238 (La.App. 4 Cir. 8/23/95), 660 So.2d 897, writ denied 95-2239 (La.11/27/95), 663 So.2d 731.
In the case sub judice, we find that a majority of the City's allegations against these Claimants rested on its belief that the Claimants embellished their injuries in order to qualify for worker's compensation benefits. Though the City's appeal was largely without merit and without documentary support, we cannot say that the City was not serious in the position it advocated. See LSA-C.C.P. art. 2164; see also A.M.K.U. Trust v. Talley, 580 So.2d 1116 (La.App. 4 Cir.1991). Moreover, we found that there existed a serious legal question regarding the computation of the offset percentage for the City. Therefore, we find that it was not apparent that the City filed this appeal for the sole purpose of the delaying the execution of the WCJ's judgment. See Pelts v. Clelland, 97-578 (La.App. 5 Cir. 10/28/97), 701 So.2d 1072. Accordingly, we deny the Claimants' request *1153 for damages against the City for defending this appeal.

SANCTIONS
The Claimants also requested sanctions against the City for its conduct during both trials. The Claimants argue that even the WCJ recommended that sanctions be assessed against the City for making several reprehensible remarks against the Claimants' character and truthfulness that were unfounded. They argue that the City attempted to deny payment by using unprofessional and unethical strategies that had no relevance whatsoever to their claim for compensation; therefore, the City should be penalized. We agree.
It is well-settled jurisprudence that a worker's compensation claimant who timely answers the appeal is entitled to increased attorney's fees and penalties to reflect additional time incurred in defending against employer/insurer's unsuccessful appealespecially where the claimant makes a clear showing of the employer's arbitrary and capricious refusal to pay the claim. See Cook v. Kaldi's Coffee House, 97-0979 (La.App. 4 Cir. 1/28/98), 706 So.2d 1052. In the instant case, there were a number of instances where the City supported its right to terminate the Claimants' benefits on mere speculations about their injuries or their ability to work. The City even characterized the Claimants as "worst than drug dealers" because the Claimants classified themselves as retired even though they continued working for less than 90% of their pre-injury wage. Thus, we also find the City attorney's conduct to be both reprehensible for an officer of the court and appropriate for sanctions. Hence, we award the Claimants herein the sum of $2,500 in globo for the additional work in this appeal.

DECREE
For the foregoing reasons, we amend the judgment of the Worker's Compensation Judge to find that the City is entitled to a 99.44% offset against Merill Juneau's worker's compensation benefits. We also grant the Claimants' answer to the appeal and award them an additional $2,500 in attorney's fees for this appeal. As it relates to all other issues raised on appeal, we affirm the judgment of the Worker's Compensation Judge.
AMENDED AND AFFIRMED AS AMENDED.
NOTES
[1] There were originally twenty Claimants in the first appeal; however, this appeal will only discuss the seventeen Claimants who were remanded by this Court following the first appeal in 1996.
[2] Claimant, Ronald Barre, was not awarded medical benefits because his claim for these benefits had prescribed.
[3] See Rapp v. City of New Orleans, 96-2925 (La.1/24/97), 686 So.2d 868.
[4] In Sumrall, the reviewing court outlined the penalty (i.e. forfeiture of any right to compensation benefits) against an employee who has made willful misrepresentations of his claim. See LSA-R.S. 23:1208(E).
[5] The WCJ did not review the bankruptcy tapes because the City failed to show that the information given by Mr. Drouant at the 341 Meeting was relevant to his claim for worker's compensation benefits.
[6] Without information regarding the employee's educational and training background and his ability to secure employment paying at least 90% of his pre-injury wage, we cannot evaluate the employee's eligibility for SEBs. See Schmitt v. City of New Orleans, 632 So.2d 367 (La.App. 4 Cir.1993).
[7] Mr. Juneau was diagnosed with a midline disc herniation at L4-5 as well as L5-S1. He received these injuries while practicing rescue procedures with the fire department.
[8] Once the City had successfully proved that these Claimants had officially retired then it could properly question their SEB entitlement. Retirement occurs for purposes of SEB entitlement when the worker either withdraws from the workforce or draws old age social security benefits, whichever occurs first. See LSA-R.S. 23:1221(3)(d)(iii); see also Breaux v. City of New Orleans, 97-0273 (La.App. 4 Cir. 8/27/97), 699 So.2d 482, writ denied 97-2491 (La.12/19/97), 706 So.2d 454. A claimant is not classified as retired when he is unemployed due to an employment injury. Id.
[9] In Hebert v. Grey Wolf Drilling Co. Inc., 611 So.2d 674 (La.App. 3 Cir.1992), the Third Circuit found that the claimant's testimony that he remained unemployed because he could not return to his pre-injury employment was sufficient for the award of SEBs. Thus, Third Circuit condemned the defendant/employer to carry the majority of the burden of proof as to the claimant's employability. We declined to follow such reasoning since we note that it is the claimant's responsibility to show by a preponderance of the evidence that he is unemployable, and he must satisfy his burden before the employer is obligated to show that the claimant is employable at his pre-injury wage. See Herty v. City of New Orleans, 94-1960 (La.App. 4 Cir. 4/13/95), 654 So.2d 785.
[10] Mr. Exsterstein was diagnosed with cervical sprain and a sprained neck as a result of delivering two portable generators and three portable Hale pumps for the fire department on November 15, 1989. Following his examination, the treating physician restricted Mr. Exsterstein from squatting, stooping, lifting objects between 25-30 pounds, bending, reaching and working above eye level. See Rapp, 681 So.2d at 447.
[11] The City argued at length that Mr. Exsterstein did not report his personal injury settlement to the City because he was attempting to support his entitlement for workers' compensation benefits. The WCJ denied the City's allegation because it concluded that Mr. Exsterstein's testimony that he did not report the settlement because his workers' compensation benefits had already been terminated was credible.
[12] The initial trial took place in June, and the WCJ delayed ruling on the Claimants' entitlement for SEBs until August.
[13] Mr. Gervais was diagnosed with intermittent rapid atrial fibrillation, history of palpitations and new onset external substernal chest discomfort associated with dyspnea. Mr. Gervais underwent coronary angiography, heart cauterization and later coronary bypass. Mr. Gervais' treating physician restricted him from returning to work as a firefighter. However, Mr. Gervais was allowed to obtain employment that did not require him to lift objects over fifty pounds.
[14] Mr. Burkart was diagnosed with a three-level herniation when he tripped on a fire hose while supervising a firefighting team at a structure location.