707 So.2d 1341 (1998)
Roger JONES, Plaintiff-Appellant/Appellee,
v.
TRENDSETTER PRODUCTION COMPANY, INC., Defendant-Appellee/Appellant.
No. 97-299.
Court of Appeal of Louisiana, Third Circuit.
February 25, 1998.
*1342 Nicholas Canaday, III, Baton Rouge, for Roger Jones.
Patricia J. Delpit, Baton Rouge, for Trendsetter Production Company, Inc.
Before DECUIR, PETERS, AMY, SULLIVAN and GREMILLION, JJ.
GREMILLION, Judge.
In this workers' compensation matter, both the plaintiff, Roger Jones, and the defendant, Trendsetter Production Company, Inc., appeal the decision of the workers' compensation judge. Following a review of the record, we reverse the decision of the workers' compensation judge and render judgment in favor of Trendsetter.

FACTS
On September 23, 1994, Jones, employed as a roughneck by Trendsetter, was allegedly injured when a metal floor came loose from its holding and fell on him and two co-workers. Jones continued working that day, but reported the next day to Riverland Medical Center in Ferriday, Louisiana, complaining of "catches" and sharp pain in his neck and cramps between his shoulder blades. He was referred to an orthopedic surgeon in Natchez, Mississippi. However, Trendsetter's workers' compensation carrier, Louisiana Workers' Compensation Corporation (LWCC), refused to pay for an out-of-state doctor and told him to choose another. Jones choose Dr. John Weiss, an orthopedic surgeon in Alexandria, Louisiana.
Dr. Weiss examined Jones initially on October 5, 1994, and determined that he had suffered multiple strains and contusions and either a left wrist sprain or a possible early hairline fracture in the proximal carpal row. In order to rule out rib fractures and vertebral body problems, Dr. Weiss ordered a CT scan and a bone scan. The CT scan of the lumbar spine showed a slight bulge of the disc at the lumbosacrum on the right side. The bone scan was negative, however, Dr. Weiss felt that there might be a slight abnormality between Jones' left and right wrist. Dr. Weiss recommended Jones use a cervical collar while traveling in a car and cervical traction while at home. He also recommended the use of a lumbosacral corset.
On October 31, 1994, Jones complained of feeling a "catchy" pain in his right lower cervical region when twisting his neck, pain on acute flexion, and pressure in the right lumbosacrum and right hip laterally. He further stated that his wrists felt weak when he awoke in the morning. Dr. Weiss told Jones to walk one mile a day and, if he was not better in two weeks, an MRI of his neck and lumbar spine would be performed. On November 14, 1994, Dr. Weiss felt that Jones was experiencing radicular pain into his right lower extremity, probably from the lumbosacrum. However, he felt that this was very poorly localized. He also determined that Jones might be having problems with his neck, although the x-rays were negative. Dr. Weiss did find that Jones had pain down to the dorsum, more radial side of the left wrist as exhibited by his weakness of grasp. He ordered a cervical and lumbar MRI, and recommended increased bed rest for Jones since he was having trouble getting consent for a lumbar corset. Dr. Weiss also noted that, "in lieu of question of validity, I would like to go ahead and schedule patient for EMG's and nerve conduction; and also, psychological evaluation, MMPI, with Dr. Quillin prior to patient's return."
*1343 The MRI of the cervical spine was negative. The MRI of the lumbar spine showed mild degenerative changes at the L5-S1 level, with mild posterior bulging, slightly worse on the right, with probably no significant compromise of the thecal sac or nerve roots. In noting that the lumbar MRI was basically normal, Dr. Weiss did not think that it was pressing in the thecal sac, although there was a slight bulge at the degenerative lumbosacrum. Taking into consideration all of the normal tests, Dr. Weiss stated that all of Jones' physical findings were strictly subjective instead of objective. He suspected that Jones had a marked emotional overlay, and that there really was no significant problem. To substantiate this, Dr. Weiss scheduled a psychological evaluation and an EMG of the lower right extremity. Dr. Weiss felt that if the EMG was normal and the Minnesota Multiphasic Personality Inventory (MMPI) showed an emotional overlay, then Jones could be released from further follow-up because he did not think there was any "objective finding of significance orthopaedically on him."
An electromyography and nerve conduction study was performed on Jones on March 21, 1995, by Dr. M. Riad Haj Murad. Dr. Haj Murad's findings report that there was no evidence of radiculopathy or neuropathy in Jones' right extremity. Jones was also seen by Dr. James Quillin, a psychologist, on March 23, 1995. Following a mental status examination, Dr. Quillin's impression was that Jones was suffering from "depression not otherwise specified" and chronic pain syndrome. After administering the MMPI and the Multi-Dimensional Pain Inventory (MPI) to Jones, Dr. Quillin found the results of the MMPI abnormal, in that it revealed Jones was suffering from a significant depression, which appeared to be associated with some mild underlying anxiety, diminished energy, and social constriction. The MMPI studies revealed a dysfunctional pain adjustment profile. Dr. Quillin's impressions were that Jones was suffering from an adjustment disorder with depressed mood secondary to back injury and chronic pain syndrome with dysfunctional pain adjustment features.
When Jones returned to Dr. Weiss on April 18, 1995, Dr. Weiss, noting the reports from Dr. Quillin, advised him that his problems were emotional and he recommended and scheduled an appointment for Jones with the Mental Health Clinic. In a physician conference report prepared by Sarah Riser, the case manager for Jones' claim, dated April 18, 1995, Dr. Weiss stated that Jones reached maximum medical improvement that day and that he was released to work with no limitations on an orthopedic basis.
That same evening, Jones went to the LaSalle General Hospital Emergency Room, where he complained of acute pain in the lower lumbar area and weakness in both lower extremities, definitely in the right lower extremity. He was admitted to the hospital for pain control, placed in pelvic traction, and given physical therapy. He was discharged the next day.
Jones was seen by Dr. I.C. Turnley, a family practitioner, on July 19, 1995. Jones complained of tenderness in the sciatic notch on the right side by the confluence of the sciatic nerve root, aggravation of his back pain upon coughing, and tenderness in his occipital nerve root on the right side. Dr. Turnley found Jones' mental and emotional state to be "a wreck at this time." He described Jones as extremely anxious, quite depressed, and unable to concentrate. Jones cried frequently during his examination, admitted being unable to sleep, experiencing constant headaches, and his activity grossly restricted due to pain. Dr. Turnley concluded that Jones suffered from a lumbar strain which was acute and chronic as a result of his September 23, 1994 accident, and chronic pain syndrome which was significant. He felt that this would not improve until Jones' emotional status was further clarified. Dr. Turnley determined that due to the chronic strain in his lumbar area, Jones was unable to perform oil field work and he should be evaluated by a pain clinic as soon as possible. Dr. Turnley recommended another MRI of the lumbar spine, if Jones continued having pain and discomfort at the level he indicated. He further felt that Jones would benefit from an orthopedic and/or neurosurgical consultation.
Jones had been receiving workers' compensation benefits from Trendsetter in the *1344 amount of $193.33 per week. Following his release by Dr. Weiss, LWCC discontinued his workers' compensation payments on June 8, 1995. On August 31, 1995, Jones filed a disputed claim for compensation seeking reinstatement of his benefits. A mediation hearing was held on September 20, 1995, at which Trendsetter was served with Jones' claim and agreed to authorize his continued medical treatment with Dr. Turnley. Trendsetter answered Jones' claim, admitting that he sustained an injury on September 23, 1994, and that it had paid workers' compensation benefits to him through June 8, 1995. However, Trendsetter denied that he was entitled to any further benefits or that he was disabled. A pre-trial conference was held on January 8, 1996, at which the parties stipulated to Jones' employment and that an accident had occurred within the course and scope of employment.
In a February 19, 1996 letter to Jones' counsel, Dr. Quillin stated that it was his opinion that the September 23, 1994 accident was the primary cause of Jones' adjustment disorder and chronic pain syndrome. He further stated that objective studies showed no evidence of malingering or symptom distortion in Jones' presentation of complaints. Dr. Quillin recommended EMG diagnostic studies and, if found to be a candidate, a brief trial of EMG directed biofeedback treatment, as well as coping skills intervention. Dr. Quillin noted that he had not been contacted by the workers' compensation carrier regarding Jones' release to any type of employment. Although he was unable to address Jones' ability to return to gainful employment at that time due to a lack of knowledge of his current condition, he stated that when he examined Jones, his condition would have precluded gainful employment. He further stated that his examination of Jones had not revealed any preexisting condition which might be a causative factor in his condition. In response to this letter, LWCC reinstated Jones' weekly workers' compensation benefits.
Jones was examined by Dr. Donald Smith, a neurosurgeon, on March 14, 1996. Dr. Smith's impression was that Jones had a muscular ligamentous strain without evidence of neurologic involvement, and prolonged inactivity and anxiety factors aggravating his underlying pain and structural problems. Dr. Smith felt that Jones should undergo a program of physical therapy, involving active range of motion and strenghtening activities for the cervical and lumbar spine. He believed that most of Jones' problems were related to his anxiety factors or his loss of income along with the significance of his underlying pains and discomfort.
Jones was also seen by Dr. Thomas Staats, a clinical neuropsychologist. Following a clinical interview, a review of Jones' medical records, and the administering of the Millon Clinical Multiaxial Inventory-III, the MMPI, the Wahler Physical Symptoms Inventory, and the Mensa Pain Test, Dr. Staats' intergrated clinical impression was that Jones was suffering from a pain disorder associated with both psychological factors (depression, anxiety, somatization, and negative traits) and a general medical condition (muscular ligamentous strain without evidence of neurologic involvement), a dysthymic disorder, a generalized dysthymic disorder, a generalized dysthymic disorder, a personality disorder, not otherwise specified, with borderline passive/aggressive and aggressive personality traits, and chronic pain syndrome. Dr. Staats felt that the level of Jones' psychosocial stressors was severe secondary to pain limitations, finances, and perceived persecution.
Jones was referred to Dr. Carlton Russ Greer, a neurosurgeon, by Dr. Turnley. Following his examination, Dr. Greer noted that there were findings suggestive of pathology in Jones' lumbar and thoracic spine. He recommended EMG/nerve conduction velocity studies of both lower extremities and an MRI of the lumbar and thoracic spine. Dr. Greer also requested a thoracic AP, lateral spine x-ray, and chest x-ray.
On April 23, 1996, Jones was seen by Dr. Frank Covington, a psychiatrist. At that time, Jones' chief complaint was "[g]ot no idea." In his assessment, Dr. Covington stated that Jones was clinically depressed. He found him relatively uncooperative, very angry, and hostile. Since Jones told him that he did not wish to take any medication, Dr. Covington did not feel that he had much to offer him. In his provisional diagnosis, *1345 Dr. Covington stated that Jones was suffering from depression, not otherwise specified, and that he should rule out major depressive disorder, single episode, dysthymic disorder, and intermittent explosive disorder. He also felt he should rule out personality disorder, not otherwise specified. Dr. Covington recommended individual therapy be provided to Jones through Dr. Quillin, since Jones did not wish to take medication.
On August 29, 1996, Jones was seen by Dr. Miguel Garcia, at the Pain and Joint Clinic in Alexandria, Louisiana. Upon examination, Dr. Garcia found tenderness in the paraspinal thoracic area, in the muscles between the thoracic spine and the scapula, more severe on the right side, and trapezius spasm. Dr. Garcia determined that Jones' range of motion was adequate. He diagnosed Jones as having myofascial pain syndrome in the trapezius, paraspinal thoracic, and cervical areas. He placed Jones on Ultram, Relafen, and Norflex.
On May 9, 1996, Trendsetter filed a Motion for Declaration of Forfeiture of Benefits Pursuant to La.R.S. 23:1208, alleging that Jones denied any medical history of prior back pain/problems when he was examined by Drs. Weiss and Quillin. Trendsetter argued that as a result of Jones' intentional false and misleading statements concerning his prior medical history, made for the purpose of obtaining workers' compensation benefits, he forfeited the right to receive such benefits. Trendsetter amended its answer on August 12, 1996, asserting the same defense. Trendsetter based its argument on the fact that Jones never reported to either Drs. Weiss or Quillin that he had suffered a previous back injury in 1987 for which he was out of work two to three years, received workers' compensation, and sought social security disability benefits.
A hearing was held in the instant matter on September 13, 1996. Several stipulations were entered into at the start of the hearing: 1) Jones was employed by Trendsetter; 2) Trendsetter paid workers' compensation benefits to Jones following the September 23, 1994 accident in the amount of $193.33 based on his average weekly wage of $289.85, however this was stopped by LWCC on June 8, 1995; 3) workers' compensation benefits were resumed on February 19, 1996, and continued through September 3, 1996; and 4) Jones was authorized after the pre-trial conference by LWCC to see a neurosurgeon of his choosing and to proceed under the care of a psychologist or psychiatrist.
Following the hearing, the workers' compensation judge issued a decision on November 8, 1996. She held that Jones' psychological disability was caused by the September 23, 1994 accident; that he was entitled to weekly workers' compensation benefits of $193.33 until he was released to work by Drs. Quillin and Greer; that Dr. Greer was authorized to treat Jones and perform any diagnostic testing deemed appropriate; that Trendsetter failed to prove Jones willfully made misrepresentations for the purpose of obtaining weekly workers' compensation benefits; and, finally, Jones' request for penalties and attorney's fees was denied. Both Jones and Trendsetter appeal this decision.

ISSUES
On appeal, Trendsetter urges three assignments of error committed by the workers' compensation judge. It argues that she erred by failing to find that Jones forfeited his rights to all benefits pursuant to La.R.S. 23:1208; in awarding weekly compensation benefits based upon a "correlation" between his current psychological condition and the September 23, 1994 accident; and, finally, in failing to introduce into the record proffered evidence of a report concerning a pre-employment physical of Jones.
Jones also asserts three assignments of error. His first two assignments of error claim that the workers' compensation judge erred in finding that LWCC was justified in terminating his weekly benefits, and in failing to award him penalties and attorney's fees as a result of that arbitrary and capricious termination. Jones also argues that the workers' compensation judge erred by failing to award him compensation benefits for the period of June 8, 1995 through February 19,1996, during which LWCC had terminated his benefits.

TRENDSETTER

Proffer of Evidence
In its third assignment of error, Trendsetter argues that the workers' compensation *1346 judge erred in refusing to admit into evidence a medical report from Dr. Herman Walker, concerning a pre-employment physical of Jones for Pride Offshore, Booker Division, on December 28, 1993. In the report by Dr. Walker, Jones replied negatively to the question concerning whether he had ever hurt his back, knees, or neck. Jones also denied that he ever received disability compensation. This report was signed by both Drs. Walker and Jones.
In refusing to admit the report into evidence, the workers' compensation judge did not elaborate on the basis for her refusal, other than stating that the report was a medical report and there were certain rules concerning the admissibility of medical reports, which this report did not meet. Evidently, the workers' compensation judge based her refusal on the fact that the report was not certified as a true and correct copy of Dr. Walker's records, nor was Dr. Walker or a representative of his office present in court to verify that the report was kept in the regular course of business. La.R.S. 13:3715.1, La.Code Evid. art. 803(6).
The decision to admit evidence into the record rests within the sound discretion of the workers' compensation judge and will not be reversed in the absence of manifest error. Faul v. Tildon A. Bonin, Contractor, 95-1236 (La.App. 3 Cir. 8/7/96); 678 So.2d 627, writ denied, 96-2221 (La.11/15/96); 682 So.2d 769. In this instance, we find that the workers' compensation judge erred by not admitting the proffered pre-employment physical into evidence.
Although the pre-employment physical is a medical record, which was neither certified nor verified in court, we find that it is extrinsic evidence of a prior inconsistent statement by Jones, which can be used to attack his credibility. La.Code Evid. art. 607(D) provides:
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
(1) Extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
La.Code Evid. art. 613 requires that extrinsic evidence of prior inconsistent statements can only be admitted into evidence "after the proponent has first fairly directed the witness' attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so."
In the case sub judice, counsel for Trendsetter questioned Jones concerning his employment with Pride Offshore, Booker Division. He was asked if he applied for a job with them, if he worked for them, and if he remembered taking the pre-employment physical. Jones answered in the affirmative and also stated that he remembered the physical being administered by a doctor from Houma, Louisiana, although he did not remember Dr. Walker's name, or if he was asked questions by the doctor during the physical. When shown Dr. Walker's report and asked if his signature was located in the bottom left-hand corner, Jones replied that it "could be. It looks like my signature." Thus, we find that the proper foundation was laid for admitting the prior inconsistent statement into evidence and that Jones was given the opportunity to admit or deny making the prior statement. Although Jones did not recall Dr. Walker asking him questions during the physical, this "lack of recollection is the equivalent of a denial for purposes of laying the proper foundation for impeachment through extrinsic evidence." Busby v. St. Paul Ins. Co., 95-2128 (La.App. 1 Cir. 5/10/96); 673 So.2d 320, f.n. 10, writ denied, 96-1519 (La.9/20/96); 679 So.2d 443.
We further find that Trendsetter presented sufficient evidence to authenticate Dr. Walker's report, through the foundation laid by it prior to requesting the report's admission into evidence. La.Code Evid. art. 901(A) provides that "[t]he requirement of authentication or identification as a condition *1347 precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." There was sufficient evidence, through Jones' testimony and his identification of his signature, to support a finding that the report was what Trendsetter claimed it was. For the foregoing reasons, we find that the workers' compensation judge erred in refusing to admit the report into evidence. Her ruling is reversed and the report is admitted into evidence.

Forfeiture of Benefits
La.R.S. 23:1208 provides that an employee who makes a false statement or misrepresentation for the purpose of obtaining workers' compensation benefits shall forfeit his right to those benefits. Thus, in order to forfeit benefits, the workers' compensation judge must determine that: 1) there is a false statement, 2) it is willfully made, and 3) it is made for the purpose of obtaining or defeating any benefit or payment. Resweber v. Haroil Const. Co., 94-2708 (La.9/5/95); 660 So.2d 7. With regard to the standard of review:
In reviewing determinations of the hearing officer, the standard of review is the manifest error or clearly wrong standard. Alexandria v. Pellerin Marble & Granite, 93-1698 (La.1/14/94); 630 So.2d 706. However, this court has a constitutional duty to review facts. Ambrose v. New Orleans Police Dep't Ambulance Serv., 93-3099, 93-3110, 93-3112 (La.7/5/04); 639 So.2d 216.
Sumner v. Lake Charles Marine, 96-280, p. 4 (La.App. 3 Cir. 6/5/96); 676 So.2d 653, 655, writ denied, 96-1772 (La.10/11/96); 680 So.2d 645.
On May 27, 1987, Jones injured his back while unloading a bean truck for Louisiana Delta Plantation in Larto, Louisiana. Jones was initially treated by Dr. William Coney, a general practitioner, who then referred him to Dr. Frazier Gaar, an orthopedic surgeon. On June 2, 1987, Dr. Gaar admitted Jones into the hospital for three days, placed him in traction, and prescribed physical therapy twice a day. A lumbar myelogram and a CT scan of the lumbar spine revealed a herniated disc at the L5-S1 disc level on the right side. Jones received an epidural steroid injection in his back.
Jones was seen by Dr. John Patton, a neurosurgeon, on July 28, 1987. At that time, Jones complained of back pain with radiation into both buttocks, worse in the right leg, radiating down the posterior aspect of his right leg to his knee. Dr. Patton felt that Jones had a possible right-sided, lumbar, herniated nucleus pulposus. A CT scan revealed a probable right-sided extruded disc fragment at the L5-S1 level. On September 23, 1987, Dr. Patton told Jones that he should either learn to live with his discomfort or consider a microdiscectomy if his pain was too severe. An MRI on February 17, 1988, revealed degenerative changes at the L5-S1 level, which could represent a very small herniation along with impingement upon the right S1 nerve root. On September 22, 1988, Dr. Patton again told Jones to learn to live with the discomfort and released him to light-duty activities with restrictions of no bending, lifting, or standing for prolonged periods of time. Dr. Patton still recommended a lumbar discectomy if Jones' pain became too severe.
In 1990, Jones sought social security disability benefits as a result of his 1987 back injury. On July 19, 1990, the Social Security Administration denied Jones claim for benefits. The disability determination rationale stated:
You said that you were unable to work because of back and shoulder problems. Although your back and shoulder condition may have caused pain and discomfort, it did not keep you from performing normal activities. You were sometimes stiff, but you were able to walk well enough to do some kinds of work. The evidence showed no other conditions which limited your ability to work. We realize that your condition prevented you from doing your job as a derrick hand, but it did not prevent you from doing other work. Based on your age (25), education (6th grade), and past work experience, you could do other work.
Your overall condition did not meet the basic definition of disability as defined by Social Security.
*1348 In her written reasons for judgment, the workers' compensation judge stated that "[t]here is no direct evidence of any false or intentionally misleading statements made by claimant for the purposes of obtaining compensation benefits. Therefore, defendants (sic) 1208 defense must fail."
In his initial examination of Jones, Dr. Weiss noted that Jones' past medical history was "[n]egative for above. Serious illness none. Did have acute bronchitis as a child frequently, but none since. Surgerynone. Allergynone." The information which Dr. Weiss referred to as "above" was that concerning Jones' present illness, a back injury. Dr. Quillin's medical records note that Jones' past medical history was "essentially noncontributory" on March 23, 1995. Jones reported a bout of bronchitis as a child, but that his health was otherwise good. Dr. Quillin further noted that Jones' legal history was negative.
In addition to the pre-employment physical, as discussed above, Trendsetter introduced an employment application by Jones from D & D Petroleum Company. In that application, dated July 16, 1993, Jones answered in the negative to the questions "have you ever had a rupture" and "have you ever made a claim under workers' compensation?" Jones also left blank the question, "have you ever been involved in an accident?"
These statements are in direct conflict with Jones' responses to interrogatories and his deposition and hearing testimony, where he described his back injury in 1987. When questioned, Jones testified that he could not remember if he told Dr. Weiss about his 1987 injury, but stated that if Dr. Weiss asked him, then it would be in the doctor's medical records. He further stated that unless Dr. Weiss specifically asked him about previous medical tests he had undergone, he did not volunteer the information. In his deposition, Dr. Staats testified that, in addition to informing him that he had suffered a ruptured disc in a prior injury, Jones told him that he had experienced mild pain since that injury. Dr. Quillin testified that when he asked Jones about his legal history, he was specifically referring to criminal history, such as arrests. At the hearing, Jones testified that he was convicted of theft, burglary, and aggravated battery prior to his September 1994 accident.
Trendsetter also introduced Jones' 1990 application for social security disability benefits. The application lists a bad shoulder and a herniated disc in his back as his disabling conditions. In the work activity portion, Jones identified Marshall Industries as his employor from December 1989 through January 1990. He stated that his employment ended there because his "back hurt too much couldn't get up." In remarking about his work history, Jones stated in the application, "I don't know much about nothing. But I do know I've ruined my back for nothing." When questioned about these entries, Jones' testified that he did not remember reading or signing his name to the application, and that the handwriting on the application did not look like either his or his wife's. Jones did admit that the signature contained on the application looked like his. When questioned about the Marshall Industries entry, Jones testified that he did not remember stating that he quit because his back hurt, nor did he think that his employment ended for that reason. Even though the application listed a herniated disc as his disabling condition, Jones testified that he had no idea what was wrong with his back when he applied. He testified that he only knew that he had a problem with his back.
Trendsetter further questioned Jones about a January 5, 1994 notation in Dr. Coney's medical record, which states that he needed a note concerning his disability to do heavy work. Jones testified that he did not recall seeing Dr. Coney in 1994 or receiving such a note.
Considering the evidence presented, we find that the workers' compensation judge erred in failing to find that false statements were made by Jones, which were willfully and deliberately made for the purpose of obtaining workers' compensation benefits. It is obvious that Jones failed to tell the truth to Drs. Weiss and Quillin when they were taking information concerning his prior history. We find it hard to believe that he could forget a back injury which kept him out of work several years and resulted in him filing for social security benefits in addition to the *1349 workers' compensation benefits he received. Jones did not begin telling the truth until after he hired his attorney and filed this claim for compensation. Thus, we find that the statements were made purposefully in order to obtain workers' compensation benefits. Under the facts of this case, we believe that Jones would have been eligible for workers' compensation benefits despite his prior injury. However, we find that he forfeited his right to such benefits as a result of his false statements.
Considering our finding, all remaining assignments of error are rendered moot.

CONCLUSION
For the foregoing reasons, the decision of the workers' compensation judge is reversed and judgment is rendered in favor of the defendant, Trendsetter Production Company, Inc. All costs of this matter are to be paid by the plaintiff, Roger Jones.
REVERSED AND RENDERED.
PETERS, J., dissents and assigns reasons.
PETERS, Judge, dissenting.
I respectfully disagree with the majority's conclusion that the judgment of the workers' compensation judge should be reversed based upon the provisions of La.R.S. 23:1208. As pointed out by the majority, the determinations of the workers' compensation judge are subject to the manifest error standard, and I find no such error in the workers' compensation judge's conclusion that "[t]here is no direct evidence of any false or intentionally misleading statements made by claimant for the purpose of obtaining compensation benefits."
La.R.S. 23:1208(A) provides: "It shall be unlawful for any person, for the purpose of obtaining ... any benefit or payment under the provisions of this Chapter ... to willfully make a false statement or representation." The statute provides both criminal and civil penalties for violation of its provisions. Additionally, La.R.S. 23:1208(E) requires, upon determination by the workers' compensation judge, forfeiture of the right to compensation benefits for violation of the statute. This statute "applies to situations where, during a pending claim, a claimant has made a false statement or misrepresentation for the specific purpose of obtaining worker's compensation benefits." Wise v. J.E. Merit Constructors, Inc., 97-0684, p. 6 (La.1/21/98); 707 So.2d 1214, 1217. Thus, under La.R.S. 23:1208, the employer or insurer must establish that the employee made a false statement or representation after an accident has occurred and a claim has been made and that the false statement or representation was willfully made for the purpose of obtaining any benefit or payment. Resweber v. Haroil Constr. Co., 94-2708, 94-3138 (La.9/5/95); 660 So.2d 7.
The accident sued upon in this case occurred on September 23, 1994. The insurer argues that Jones made false statements to Dr. Weiss and/or Dr. Quillin by failing to fully disclose his medical history to them when they examined him. Jones first saw Dr. Weiss on October 5, 1994, and first saw Dr. Quillin on March 23, 1995. In the first visit to each of these physicians, the physicians recognized that Jones was suffering from psychological difficulties. Neither of these physicians required that Jones complete a medical history questionnaire, but rather confined their inquiry on that subject to the patient's response to interrogation. In fact, Dr. Quillin had no definite recollection of his interview with Jones and simply testified that it is his practice to ask a patient to relate his past medical history of illness or chronic illness; to relate whether he has previously been treated for psychological or psychiatric problems; and to relate whether there is a family history of emotional, psychiatric, or psychological disorders.
Jones, who has a sixth-grade education, testified that he understood the questions to relate to his general medical background and family history and that he attempted to answer them truthfully as he understood them. The three times in which there is a record of the specific questions asked, Jones responded truthfully to questions concerning his past injuries.[1]
*1350 The defendant's contention that La.R.S. 23:1208 applies is based solely on the recorded responses of a man with a sixth-grade education, suffering from an injury with a psychological overlay, to physicians who have no record of the specifics of the questions asked. Thus, the worker's compensation judge was asked to deny benefits to Jones for supposedly false answers to supposed questions which Jones supposedly understood, if they were in fact asked. In considering this defense, the worker's compensation judge was faced with positive evidence that each time Jones was specifically asked about his prior injuries, he was totally truthful.
Given this background, the majority would find that the worker's compensation judge committed manifest error and was clearly wrong in reaching the factual conclusion that Jones should not forfeit the right to benefits under La.R.S. 23:1208. Forfeiture is an extremely harsh remedy, and statutes relative to forfeiture should be strictly construed. Wise, 707 So.2d at 1218. However, even without considering the strict-construction analysis required in a forfeiture situation, I conclude that this is a classic manifest error case. As such, this court should not substitute its judgment on credibility and factual determinations for that of the worker's compensation judge. I would affirm the judgment in all respects.
NOTES
[1] Specifically, Jones responded truthfully in his answers to interrogatories, in his response to questions in a deposition, and at trial.