# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 22-554


CAROL JOSEPH

VERSUS

AT&T


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 4
PARISH OF LAFAYETTE, NO. 08-01347
ADAM C. JOHNSON, WORKERS COMPENSATION JUDGE

\*\*\*\*\*\*\*\*\*\*

## CANDYCE G. PERRET
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, Candyce G. Perret, and Sharon Darville Wilson, Judges.


**AFFIRMED.**

**Michael B. Miller**
**Attorney at Law**
**Post Office Drawer 1630**
**Crowley, LA   70527**
**(337) 785-9500**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Carol Joseph**

**M. Blake Monrose**
**Hurlburt, Monrose & Ernest, APLC**
**700 Saint John Street, Suite 200**
**Lafayette, LA   70501**
**(337) 237-0261**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **AT&T**

**PERRET, Judge.**

Carol Joseph, Claimant, appeals a workers' compensation judgment rendered in favor of her employer, AT&T, finding that Ms. Joseph is no longer entitled to Temporary Total Disability Benefits ("TTD"), modifying her benefits to Supplemental Earnings Benefits ("SEB"), and ultimately finding that her right to SEB has terminated. For the following reasons, we affirm.

**FACTUAL AND PROCEDURAL HISTORY:**

On September 27, 2007, Ms. Joseph fell while working for AT&T and sustained injuries to her knee and back. Since her fall, she has undergone carpal tunnel release and ulnar nerve transposition in 2011, a lumbar fusion in June 2013, and a total knee replacement of the left knee on February 7, 2019.

On July 13, 2009, the Workers' Compensation Judge ("WCJ") signed a judgment finding that Ms. Joseph "was injured in the course and scope of her employment with **AT&T** on September 27, 2007 and is entitled to temporary total disability benefits in the amount of $364.00 per week[,]" and ordering AT&T to pay all reasonable and necessary medical treatment, except a back surgery recommended by Dr. John Cobb, as well as penalties and attorney fees.

In January 2017, AT&T filed a Motion to Modify Ms. Joseph's benefits from TTD and asserted that Ms. Joseph's condition has changed and that she was capable of returning to gainful employment. The WCJ signed a judgment on June 27, 2017, finding that Ms. Joseph was no longer entitled to TTD but was entitled to SEB at a zero-wage earning capacity. In oral reasons, the WCJ stated:

> [T]here has been a change in condition, in that her physical condition has reached a point of stability where the doctor has discharged her from anything beyond maintenance treatment; and therefore, her condition is no longer one of active treatment and therefore, is not temporary.

I cannot and refuse to address on the evidence at hand whether or not she may be in a position of permanent and total disability because without raising that claim there are so many factors that I cannot address, such as rehabilitation.

. . . .

The weight of the medical evidence is that she is at sedentary employment status and without additional evidence such as might be provided by a vocational counselor or otherwise by the doctors themselves through deposition or other discovery, I can't make those determinations.

. . . .

And as I've indicated, that doesn't preclude a subsequent inquiry into permanent and total status, but that was not presented to me for determination today.

In January 2019, Ms. Joseph filed a Motion and Order to Modify Judgment seeking to have her benefits modified from SEB to either TTD or Permanent Total Disability Benefits ("PTD") due to a scheduled knee replacement surgery. The hearing was held on October 10, 2019, after Ms. Joseph's knee replacement. The WCJ signed the judgment on January 28, 2020, modifying the 2017 Judgment and finding that Ms. Joseph was entitled to TTD beginning February 7, 2019.

Pertinent to the judgment on appeal, on July 30, 2021, AT&T filed a Motion to Modify Judgment seeking to end Ms. Joseph's TTD alleging that she was capable of returning to employment. AT&T further asserted that as of June 2018, Ms. Joseph had received more than 520 weeks of SEB, thus, her ability to collect SEB terminated. AT&T explained that two and a half years had elapsed since Ms. Joseph's knee surgery; that according to medical records and a Functional Capacity Evaluation from the Fontana Center ("the Fontana FCE"), her knee is at maximum medical improvement; and that Ms. Joseph is capable of sedentary work or light

work activities with restrictions. Thus, AT&T requested that the court modify the 2020 Judgment modifying TTD to SEB.

Ms. Joseph answered and asserted that she was "either temporary or permanently totally disabled" and, thus, entitled to continuing indemnity benefits. Ms. Joseph attacked the legitimacy of the Fontana FCE and asserted that due to other factors such as her age, race, and failed surgeries, she will not be able to return to gainful employment.

A hearing on AT&T's motion was held on September 10, 2021, and post-hearing briefs were submitted. On November 3, 2021, the WCJ issued oral reasons for ruling after recounting the evidence and testimony as well as applicable law. Additional reasons were assigned on November 4, 2021. The WCJ granted AT&T's motion to modify, finding Ms. Joseph entitled to SEB not TTD. However, as Ms. Joseph had received more than 520 weeks of benefits, the WCJ terminated Ms. Joseph's indemnity benefits. Judgment was signed on November 4, 2021.[1]

Ms. Joseph now appeals and assigns four Assignments of Error:

1.      The workers' compensation judge erred in failing to address Ms. Joseph's claim for permanent and total benefits and failed to address relevant evidence favorable to Ms. Joseph on the issue of permanent and total disability.

2.      The workers' compensation judge erred in using the FCE performed by the Fontana Center.

3.      The workers' compensation judge erred in failing to award Ms. Joseph permanent and total disability benefits.

4.      The workers' compensation judge erred in not allowing evidence located from T-672, L. 4 to T-673, L. 4 and the records of Dr. [John] Sledge and Dr. [Daniel] Hodges.

---

[1] Initially, Notice of Interlocutory Judgment was sent to the parties on November 8, 2021. At a hearing on January 13, 2022, the WCJ clarified that the judgment was a final judgment, and the parties agreed the notice they received constituted notice of a final judgment and waived additional notice of said judgment.

**STANDARD OF REVIEW:**

When reviewing the factual findings of the WCJ on appeal we apply the manifest error standard of review. *Numa C. Hero & Son v. Leleux*, 15-305 (La.App. 3 Cir. 10/28/15), 178 So.3d 595. "Whether the burden of proof has been satisfied and whether testimony is credible are questions of fact to be determined by the WCJ. Under the manifest error rule, the reviewing court does not decide whether the factfinder was right or wrong, but only whether its findings are reasonable." *Id*. at 598 (citations omitted).

**DISCUSSION:**

Ms. Joseph's Assignments of Error can be categorized generally as errors pertaining to evidentiary matters and errors pertaining to Ms. Joseph's claim for PTD.

**<u>Assignments of Error One & Three:</u>**

Ms. Joseph asserts that the WCJ legally erred by failing to address her entitlement to PTD when the court acknowledged that the issue was put forth in Ms. Joseph's answer. She also asserts it was legal error for the WCJ to not mention the records of Dr. Stanley Foster, who opined in 2014 regarding Ms. Joseph's likelihood of returning to gainful employment and to not consider non-physical facts, including her age, time out of the work force, her race, her weight, her gender, and her substantial pain, that would entitle her to PTD. Ultimately, Ms. Joseph asserts that the WCJ erred in failing to award her PTD.

Legal error, Ms. Joseph argues, requires this court to perform a de novo review of the record instead of a manifest error review. "Where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the reviewing court should make

4

its own independent *de novo* review and assessment of the record." *Campo v. Correa*, 01-2707, p. 10 (La. 6/21/02), 828 So.2d 502, 510 (emphasis in original).

Ms. Joseph's first Assignment of Error suggests the WCJ failed to address her claim for PTD. In order to be entitled to PTD, the injury must produce the "permanent disability of an employee to engage in any self-employment or occupation for wages[.]" La.R.S. 23:1221(2)(a). The WCJ's reasons for ruling and judgment do not state that Ms. Joseph's request for permanent disability was denied. However, the WCJ modified Ms. Joseph's benefits from TTD to SEB. By finding Ms. Joseph was entitled to SEB, the WCJ determined that she was capable of returning to gainful employment, which ipso facto precludes a finding that she is permanently and totally disabled. Thus, we find no merit to this argument.

We also find no merit to Ms. Joseph's contention that the court did not consider relevant evidence including non-physical factors, such as age, weight, race, gender, and pain, and Dr. Foster's opinion. This court recently decided a very similar claim in *Leonards v. Carmichael's Cashway Pharmacy, Inc.*, 22-22 (La.App. 3 Cir. 5/18/22), 339 So.3d 741, *writ denied*, 22-972 (La. 10/4/22), 347 So.3d 887, wherein it reviewed both *Pinkins v. Cardinal Wholesale Supply, Inc.*, 619 So.2d 52 (La.1993), cited by Ms. Joseph, and *Comeaux v. City of Crowley*, 01-32 (La. 7/3/01), 793 So.2d 1215, regarding what factors should be considered in a PTD determination. In *Leonards*, 399 So.3d at 746-47, this court stated:

> Ms. Leonards also asserts that the WCJ legally erred in failing to consider both physical and non-physical factors in finding that she is not disabled. She argues that the case of *Pinkins v. Cardinal Wholesale Supply, Inc.*, 619 So.2d 52 (La.1993) mandates a de novo review and a reversal of the WCJ.
>
> Mr. Pinkins was a fifty-seven-year-old truck driver injured in the course and scope of his employment. He had completed the sixth grade, was semi-literate, and could perform only simple addition and

5

subtraction. Mr. Pinkins was limited to lifting ten to fifteen pounds, restricted from repetitive bending, stooping, crawling, or kneeling, and could not sit for extended periods of time. No realistic prospects for improvement of Mr. Pinkins' condition were projected.

Nonetheless, the employer identified a job it maintained Mr. Pinkins could perform, and it was approved by his physician. The supreme court reversed the courts below, which had found that Mr. Pinkins was precluded from receiving SEBs. The supreme court stated that "under the facts presented by this particular case only, due to the totality of factors related to a realistic appraisal of access to employment, this claimant's marginal literacy, age and work[-]related disability," Mr. Pinkins was entitled to SEBs, as the employer had failed to prove his earning capacity. *Id*. at 54.

The Louisiana Supreme Court, in *Comeaux v. City of Crowley*, 01-32 (La. 7/3/01), 793 So.2d 1215, held that in determining an injured employee's status as permanently, totally disabled, the WCJ must read La.R.S. 23:1226 *in pari materia* with La.R.S. 23:1221(2). The WCJ in *Comeaux* had opined that La.R.S. 23:1221(2) provided the focus for his inquiry into the employee's permanent total disability status, and that statute discusses only whether the employee is physically able to work. Louisiana Revised Statutes 23:1226(D) reads:

> Prior to the workers' compensation judge adjudicating an injured employee to be permanently and totally disabled, the workers' compensation judge shall determine whether there is reasonable probability that, with appropriate training or education, the injured employee may be rehabilitated to the extent that such employee can achieve suitable gainful employment and whether it is in the best interest of such individual to undertake such training or education.

"[I]t would defy logic and render La.Rev.Stat. 23:1226 meaningless to exclude from consideration the employee's inability to be educated or retrained in determining if such an employee is permanently, totally disabled." *Comeaux*, 793 So.2d at 1222. The totality of circumstances, including the employee's physical restriction to sedentary work and his lack of intellectual capacity to be retrained, led the supreme court to find that he had proven his entitlement to permanent total disability benefits by clear and convincing evidence.

We note that both *Pinkins* and *Comeaux* require fact-specific analyses of each case; indeed, as quoted from *Pinkins* above, the court recognized that the application of its principles results from the factfinding process rather than interdicts it. In other words, a WCJ's decision on whether an employee has proven her case for total disability,

6

including physical and non-physical factors, is subject to manifest error in all but the rarest of cases. We decline to review this case de novo.

Additionally, the court in *Comeaux*, 793 So.2d at 1216 stated:

> We granted certiorari to determine what factors other than physical condition can be considered to determine if plaintiff is permanently, totally disabled. Although we reach the same result as the court of appeal our reasoning is more restrictive and is based on plaintiff's unsuccessful attempts at the rehabilitation required by La.Rev.Stat. 23:1226 as well as his physical condition.

In *Comeaux v. City of Crowley*, 00-928 (La.App. 3 Cir. 12/6/00), 773 So.2d 899, *aff'd on other grounds*, 01-32 (La. 7/3/01), 793 So.2d 1215, the third circuit determined that the claimant was permanently and totally disabled, reversing the finding of the WCJ that claimant was entitled to SEB. The third circuit concluded that La.R.S. 23:1221(2) "should be interpreted to include a totality of factors when determining whether a claimant is totally and permanently disabled such as access to employment, physical factors, age, race, literacy, and experience." *Id*. at 902. The third circuit stated:

> Mr. Comeaux is now fifty-eight years old and has reached maximum medical improvement. The Functional Capacity Evaluation, as well as the opinions of both physicians, indicate that Mr. Comeaux is unable to work but is encouraged to be as active as possible within the parameters of light and sedentary activities as tolerated. Coupled with Mr. Comeaux's physical deficiencies and his age, work experience and educational inadequacies, our review of the entire record reveals that Mr. Comeaux proved by clear and convincing evidence that he is permanently and totally disabled and under 23:1221(2).

*Id*. at 904.

However, on review, the supreme court affirmed the court of appeal's ruling but for more restrictive reasons. The supreme court highlighted the evidence of claimant's unlikely rehabilitation that was introduced into evidence and noted the report of the defendant's doctor which said that the claimant has "'very limited skills as far as reading and writing, and his previous occupation has been as a laborer.'"

7

*Comeaux*, 793 So.2d at 1223. The court even considered the testimony of a vocational rehabilitation expert who testified at a prior trial and opined that claimant "would never again be able to work." *Id*. Thus, the supreme court concluded: "We therefore hold that plaintiff's unsuccessful attempt at the rehabilitation required by La.Rev.Stat. 23:1226 is a proper factor to consider, along with his physical incapacity, in deciding his disability status." *Id*. at 1224.

In the current case, the WCJ not only witnessed Ms. Joseph's live testimony but also provided several pages of reasons detailing the testimony and evidence reviewed by the court. Specifically, the WCJ summarized Ms. Joseph's testimony regarding her pain, her own belief that she cannot return to work, and what she can accomplish on her good days and bad days. Unlike in *Comeaux*, there was no evidence presented that Ms. Joseph could not be rehabilitated.

While it is an employer's burden to modify a claimant's benefits from TTD to SEB, *see Numa C. Hero*, 178 So.3d 595, where a claimant seeks PTD, it is the claimant's burden to prove that she is permanently and totally disabled by clear and convincing evidence. La.R.S. 12:1221(2)(c); *Comeaux*, 793 So.2d 1215. "'[C]lear and convincing'" is defined as "'an 'intermediate' standard falling somewhere between the ordinary preponderance of the evidence civil standard and the beyond a reasonable doubt criminal standard.'" *Id*. at 1221 (quoting *Hatcherson v. Diebold, Inc.*, 00-3263, p. 4 (La. 5/15/01), 784 So.2d 1284, 1288).

Louisiana Revised Statutes 23:1221(2)(c) states:

> For purposes of Subparagraph (2)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subparagraph (2)(b) of this Paragraph, compensation for permanent total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character

8

of the employment or self-employment, including, but not limited to, any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.

In the current case, the evidence that was presented included Ms. Joseph's testimony. Ms. Joseph testified that she is a black female who, at the time of the hearing, was sixty-seven years old. She testified that she is no longer undergoing any physical therapy and is not under any active orders for such therapy. The only doctor she sees on a regular basis is Dr. Hodges, her pain management doctor. Ms. Joseph testified that, in her opinion, she cannot return to work because of her pain and her pain medication:

> Q. And my understanding, and correct [me] if I'm wrong, but you don't think you can return to work because you're just in too much pain?
>
> A. I do have a lot of pain.
>
> Q. Is that the reason you can't return to work?
>
> A. Not only that. It's because I am on medication, as well, and when I take my medication it puts me to sleep. And it's no, I wouldn't be able to barely go to work and because I take medication and there's no way.
>
> Q. Have you ever - - have you gone to any employers and asked them whether they're willing to employ you?
>
> A. No.
>
> . . . .
>
> Q. Okay. Since you've had your back surgery and your knee surgery, have you applied for any jobs?
>
> A. No, sir.
>
> . . . .
>
> Q. Well, if [an] employer was willing to take you back on your medication, would you be able to go back to work?

A. Because I am - - I wouldn't be able to because I have - - it puts you to sleep.

As recounted in the WCJ's reasons for ruling, Ms. Joseph also testified regarding what she could do on a good day and on a bad day. She further testified that she is fearful to drive a vehicle because of knee spasms.

Ms. Joseph submitted a report from Dr. Clark Gunderson dated January 22, 2009, certified records from Dr. Foster, a Functional Capacity Exam from 2011, and Dr. Sledge's deposition dated June 28, 2019. All of the evidence submitted suggests Ms. Joseph could, at the time, return to sedentary work.

Dr. Foster treated Ms. Joseph in 2007. He produced an Independent Medical Evaluation on September 16, 2008, in which he opines:

> I do feel that she can treat her back with conservative measures, meaning physical therapy and non-steroidal anti-inflammatories and once the carpal tunnel and cubital tunnel releases have been accomplished then she should be able to return to her previous occupation.

Dr. Foster re-evaluated Ms. Joseph on November 11, 2014, and issued a report, wherein he describes her post-surgery back condition as well as her complaints of knee pain. His final opinion was that Ms. Joseph could return to sedentary work but further noted as follows:

> I do feel that she will need some continued medical management depending on how her fusion progresses and whether or not the radicular symptoms in her left leg resolve. In regards to gainful employment, certainly I think that she can return to at least a sedentary duty status. However, with that being said she is now 60 years old and she has been out of the work force for 7 years. I do not feel that she will ever return to any gainful employment.

The 2011 FCE concluded Ms. Joseph could perform sedentary duties, but cautioned: "Ms. Joseph is significantly deconditioned and would have difficulty working consistently at even a Sedentary level at this time due to the HR elevation

to dangerous levels with even working with the lightest objects and performing regular tasks such as sit to stand and trying to bend forward."

Lastly, Dr. Sledge testified in his deposition that, according to his September 5, 2018 report, he believed Ms. Joseph had reached MMI for her back and had been released to sedentary work status. However, after her knee replacement, on May 8, 2019, he opined that while her recovery was going well, he had reservations that, in his opinion, prevented Ms. Joseph from returning to gainful employment at the time, specifically, "My concerns about her stability, her balance, her recovery and her - - the question of potentially improving her range of motion or functionality[.]" However, Dr. Sledge did opine: "If we see the results we're expecting from the physical therapy, yes, afterwards there's a chance she would be able to work."

Additionally, the evidence submitted by AT&T also suggests that Ms. Joseph can return to sedentary work. The Second Medical Opinion from Dr. Michael Duval on February 18, 2021, found that, despite her complaints of her knee giving way, Ms. Joseph's knee was at MMI and that an FCE was needed to assess her level of function. Following a review of the 2021 Fontana FCE, Dr. Duval opined that Ms. Joseph "should be able to function at light work activities with restrictions on squatting and climbing[.]"

The Fontana FCE letter (emphasis in original) to Dr. Duval stated:

We had the opportunity to work with Ms[.] Joseph over an 8 hour period today. During this time **she demonstrated the ability to sustain activity at the sedentary work level** with the significant restrictions as listed on the attached functional capacity report.

. . . .

[E]ven though it is our opinion that Ms. Joseph is magnifying her pain behavior and complaints in a **conscious** manner that she still has

11

**demonstrated the ability to sustain work at the sedentary work level** as described in the attached functional capacity report.

After relating Ms. Joseph's capacity to sit, stand, and walk continuously, or a combination therefore, the FCE report does caution that "we are unable to state conclusively whether the client would be able to maintain this work level over a 40 hour work week."

Paul Fontana testified at length regarding the tests used during Ms. Joseph's evaluation and the reasons that she was labeled as a Type II Symptom Magnifier, which included:

> A. The supine seated, where all of a sudden there's no pain at 36 degrees more range of motion. The one that you failed to bring up during the initial baseline assessment, "When the client was asked to bend forward, trunk flexion, the client demonstrates full flexion with significant increases in low back pain at end range and her movements were very slow and labored with increased visual pain posture. However, during distraction, unaware that she was being watched, she was observed to quickly fully flex her trunk to retrieve her purse off the floor when leaving for lunch. Her movements were quick, smooth and fluent with no increases of difficulty."

> Again, if you don't know I'm looking at you and all of [a] sudden you do this and pick something - - that doesn't make any sense. The other one that you didn't talk about when we asked her to climb stairs. Slow, labored, she can't hardly pick up her step. Yet when we asked her to get up on the mat table which has a six-inch-high step just like my stairs - -

> . . . .

> A. - - at the same height as my stairs, she did it quickly and smoothly without any use of a stationary object. Yet when she knows when we're looking at her ability to climb, she can't climb. That's the correlation we're talking about and that just doesn't make sense.

While we are mindful of the supreme court's decision in *Comeaux*, 793 So.2d 1215, to consider non-physical factors, namely the claimant's success at rehabilitation, we simply do not find those facts in this case. There is simply no recent evidence or opinions regarding Ms. Joseph's ability to be rehabilitated at this

point in time, other than the clearance to sedentary duty by multiple healthcare professionals. Based on the evidence and reviewing the WCJ's findings, we cannot say the WCJ manifestly erred in its decision to modify Ms. Joseph's benefits from TTD to SEB as Ms. Joseph failed to prove by clear and convincing evidence that she was entitled to PTD. Thus, we affirm the WCJ's judgment.

**Assignment of Error Four**:

Ms. Joseph alleges that the WCJ erred in excluding certain lines of Mr. Fontana's testimony and records from Dr. Sledge and Dr. Hodges from evidence. As to the records sought to be admitted, they were uncertified medical records, and Ms. Joseph asserts with no further explanation that they "are otherwise reliable and should be allowed into evidence, especially [the records of] Dr. Sledge as his deposition is already in the record." AT&T objected to the medical records' introduction on the basis that they were uncertified and incomplete. AT&T cites to LAC 40:1.6209, which sets forth the manner in which medical evidence must be introduced: by certified medical records, depositions, oral examination in court, and "any other manner provided by law."

Regarding evidence in workers' compensation cases, this court has stated:

> As recognized by the Louisiana Supreme Court in *Chaisson v. Cajun Bag & Supply Co.*, 97-1225, pp. 9-13 (La. 3/4/98), 708 So.2d 375, 381-82:
>
> > [U]nder the express language of LSA–RS 23:1317, worker's compensation hearing officers are "not bound by the technical rules of evidence." *Id.* In other words, the hearing officer has the discretion to admit evidence that would otherwise be inadmissible under the Louisiana Code of Evidence. This more relaxed standard for the admissibility of evidence is the general rule in proceedings before administrative agencies. MCCORMICK ON EVIDENCE § 352 (4th ed.1992). The legislative requirement that a hearing officer's factual findings be based upon competent evidence is the safeguard that

13

ensures that the factual findings are made on evidence that has some degree of reliability and trustworthiness, notwithstanding that the evidence might fall outside of the technical rules for admissibility. . . Although the Legislature has not defined "competent evidence," in order to give the relaxed evidentiary standard in LSA–RS 23:1317 effect, it must not be defined so narrowly as to mean only evidence that would fall within the parameters of the Louisiana Code of Evidence.

. . . .

To give effect to the more relaxed evidentiary standards in LSA–RS 23:1317, we hold that the hearing officer has the discretion to admit hearsay evidence in worker's compensation proceedings. We further hold that such evidence can qualify as "competent evidence," provided that the evidence has some degree of reliability and trustworthiness and is of the type that reasonable persons would rely upon. This determination must be made on a case-by-case basis under the particular facts and circumstances. The reviewing court must evaluate the competency of the evidence under the manifest error standard.

*White v. WIS Int'l*, 19-747, p. 17 (La.App. 3 Cir. 5/20/20), 298 So.3d 237, 248-49, *writ denied*, 20-770 (La. 10/6/20), 302 So.3d 533. In *White*, this court determined that medical records contained within the certified State Farm claims file were properly admitted where the file contained a certification for the records and the claimant testified that she had no reason to disagree with what the medical records stated. This court found no abuse of discretion stating: "the record supports a finding that the records have 'some degree of reliability and trustworthiness and [are] of the type that reasonable persons would rely upon.'" *Id*. at 249 (citation omitted).

This court has further noted that "despite the more relaxed nature of a worker's compensation proceeding, 'the rule concerning expert [medical] testimony is more stringent[.]'" *Charles v. Lake Charles Mem'l Hosp.*, 06-1590, p. 6 (La.App. 3 Cir. 5/30/07), 959 So.2d 571, 576, *writ denied*, 07-1607 (La. 10/26/07), [966 So.2d

14

581]." *Vaughn v. Dis-Tran Steel, LLC*, 17-689, p. 17 (La.App. 3 Cir. 2/7/18), 239 So.3d 893, 904, *writ denied*, 18-396 (La. 5/9/18), 241 So.3d 998. The *Vaughn* court noted the ways in which expert medical testimony may be admitted by citing LAC 40:I.6209(A).

After reviewing the proffered records of Dr. Sledge, which records are dated from 2016 until January 30, 2019, prior to Ms. Joseph's knee replacement surgery, and considering their uncertified nature, we find no abuse of discretion in the WCJ's determination that these records were inadmissible. Furthermore, Dr. Sledge's deposition was introduced and considered, so any error would be harmless.

The proffered records of Dr. Hodges are also not certified but contain a certification of billing records dated May 1, 2017. Additionally, within those records is a subpoena received by Dr. Hodges' office on February 11, 2014. Following that letter, there is a certification page dated February 24, 2014, and a bill for copies of 273 pages of records in response to the February 11, 2014 subpoena. Following the certification are vocational rehabilitation reports, dated in 2012, from Sy Arceneaux requesting Dr. Hodges either agree or disagree with the job analysis of a position identified for Ms. Joseph through labor market surveys. Dr. Hodges indicated that he would consider the positions after Ms. Joseph was seen by Dr. Sledge. The most recent record in the proffered documents from Dr. Hodges is dated March 13, 2017, prior to Ms. Joseph's knee replacement. As of September 2016, Dr. Hodges had Ms. Joseph on a no work status, and in June 2016, he opined: "We will see her again in 3 months I think, for all intents and purposes, this lady is disabled from any sort of future meaningful employment." Dr. Hodges did not testify at the hearing nor was a deposition admitted.

Due to the discretion given the WCJ in admitting evidence and considering these records date several years before Ms. Joseph's most recent surgery and this hearing, we cannot say that the WCJ abused its discretion in finding the records inadmissible.

Additionally, Ms. Joseph argues that certain lines of questioning of Mr. Fontana, which were proffered, should have been admitted. Those transcript lines question the origins of the behavioral test used during Ms. Joseph's FCE. Through the questioning, it appears that Ms. Joseph attempts to discredit the test and indicates that Mr. Fontana is using a test developed by unknown people. Mr. Fontana testified that, while the tests were developed by other people, Darrell Schapmire developed the correlations of the test answers. The Fontana Center uses the correlations that Mr. Schapmire developed.

Prior to the proffered testimony, Ms. Joseph's counsel attempted to question Mr. Fontana regarding a statement on Mr. Schapmire's website without authenticating the statement or website or admitting either into evidence. The WCJ sustained AT&T's objection to questions regarding the website statement. When Ms. Joseph's counsel insisted on questioning Mr. Fontana about the website statement, the WCJ stepped out of the courtroom and allowed the line of questions to be proffered. The questions consisted of Mr. Fontana's agreement or disagreement with the website statement. Counsel then continued into the line of questioning regarding Mr. Schapmire's behavioral test and discovered that the tests themselves were developed by other people. Once the WCJ was present, counsel attempted to continue questioning Mr. Fontana regarding the origins of the behavioral test. The WCJ allowed another proffer.

Once the second proffer ended, Ms. Joseph's counsel was allowed to elicit information regarding the origins of the test, to which Mr. Fontana explained:

Q.    From what study did you determine that the behavior questionnaires were a reliable predictor of Type II symptom magnification syndrome?

A.    From Darrel [sic] Schapmire's research when he worked for Isotechnologies.

Q.    Can that study be found?

A.    If you could do the research.

Q.    Did you do the research?

A.    Darrell shared it with me when he - - when he came to my clinic 25 years ago, yes.

Thus, after reviewing the record as a whole, we find no error in the WCJ's decision to allow the testimony only as a proffer. Counsel was ultimately allowed to question Mr. Fontana regarding the development and origins of the behavior test.

**Assignment of Error Two:**

In her second assignment of error, Ms. Joseph attacks the FCE performed by The Fontana Center, arguing that it was biased and conducted only to destroy Ms. Joseph's credibility. Mr. Fontana also testified at the hearing regarding the FCE report and his methodology. "The decision to admit evidence into the record rests within the sound discretion of the workers' compensation judge and will not be reversed in the absence of manifest error." *Jones v. Trendsetter Prod. Co., Inc.*, 97-299, p. 11 (La.App. 3 Cir. 2/25/98), 707 So.2d 1341, 1346, *writ denied*, 98-793 (La. 5/15/98), 719 So.2d 463.

Specifically, Ms. Joseph lists the following as the problems with the Fontana FCE and argues that these faults show that The Fontana Center was biased against Ms. Joseph:

17

1. Ms. Joseph argues that The Fontana Center lied to her regarding how much weight she was pushing and pulling during one of the tests. The therapist told Ms. Joseph he had reduced the weight when he left the weight the same. Ms. Joseph then produced a better result. However, we note that Mr. Fontana explained this is done to determine whether a client gave a valid effort on the test.

2. Ms. Joseph asserts that The Fontana Center exaggerated the results of the Jamar test by 100%. The Jamar test measures grip strength and was repeated forty or so times. The FCE indicates that Ms. Joseph had an increase *of* 110% on the Jamar test. Ms. Joseph calculates that if 100% was forty pounds, then an increase *of* 110% would be eighty-four pounds. Mr. Fontana disagreed and explained it was his understanding that an increase *of* 110% would be an increase to fourty-four pounds. Mr. Fontana further testified that, regardless of your calculation, any increase should not happen. The WCJ heard Mr. Fontana's explanation regarding the calculation and his ultimate conclusion that any increase is problematic.

Ms. Joseph also asserts that the Jamar test was only used to destroy her credibility because it is unrelated to back or leg strength, and it was performed numerous times. However, Mr. Fontana explained that the purpose of an FCE is not to focus only on the injury but to test the person and to identify their ability "to sit, stand, stoop, squat, bend, push, pull, carry, climb, and work in various postures and positions."

3. Ms. Joseph finds the FCE incorrect in identifying Ms. Joseph as the "client" when Dr. Duval set up the FCE and received a more comprehensive report than what was sent to Ms. Joseph. Dr. Duval was Ms. Joseph's choice physician who ordered the FCE.

4.    Ms. Joseph was asked to sign the FCE report after it was read to her, but the report presented to her for signature did not include the pages involving symptom magnification that was sent to Dr. Duval.

5.    The Fontana Center uses the Waddell test despite the code not allowing the test in order to predict malingering. Louisiana Administrative Code, Title 40, Part 1, § 2017(A)(1)(c)(x) explains:

> x. if applicable, Waddell Signs, which include five categories of clinical signs tenderness; superficial and non-anatomic, pain with simulation: axial loading and rotation; regional findings: sensory and motor, inconsistent with nerve root patterns; distraction/inconsistency in straight leg raising findings, and over-reaction to physical examination maneuvers. Significance may be attached to positive findings in three out of five of these categories, but not to isolated findings. Waddell advocates considering Waddell's signs prior to recommending a surgical procedure. These signs should be measured routinely to identify patients requiring further assessment (i.e., biopsychosocial) prior to undergoing back surgery.
>
> (a). It is generally agreed that Waddell Signs are associated with decreased functional performance and greater subjective pain levels, though they provide no information on the etiology of pain. Waddell Signs cannot be used to predict or diagnose malingering. Their presence of three out of five signs may most appropriately be viewed as a "yellow flag["], or screening test, alerting clinicians to those patients who require a more comprehensive approach to their assessment and care plan. Therefore, if three out of five Waddell Signs are positive in a patient with subacute or chronic back pain, a psychosocial evaluation should be part of the total evaluation of the patient. Refer to Personality/Psychological/Psychosocial Evaluation.

As to Ms. Joseph's Waddell scores, Mr. Fontana explained: "I'm saying that the positive scores indicate that there's a correlation between what she scored on and those people who tested - - who demonstrated a nonphsyiological responses on that B-200 consistent with Type II symptom magnification." Mr. Fontana continued: "That means that other people who scored the same number, whatever the number was, also had a high percentage of likelihood that they tested as a nonphysiological on the B-200. There's a correlation between the two." The B-200 is a non-physical

19

questionnaire that is presented to clients at The Fontana Center. Ms. Joseph challenges the validity of the test alleging on appeal that "Mr. Fontana knows of no one else who has used this test[,]" "[t]he person who supplied the six test names were [sic] unknown and not listed as an authority in Fontana's report[,]" "Fontana has no studies to validate the testing[,]" and "Fontana did not attach copies of the test with the FCE or provide copies to Ms. Joseph.'"

Regarding the questionnaire, Mr. Fontana testified that "[r]esearch has shown that if they score positive on these tests, that correlates with people who are consciously magnifying their pain symptoms for secondary gain. So it helps us to -- to get a picture of what's going on." The tests were in Mr. Schapmire's research, which Mr. Schapmire shared with and explained to Mr. Fontana. Mr. Fontana also corrected Ms. Joseph's counsel in his belief that everyone who takes the test fails it:

> Q. You do have a pass/fail don't you? You may not call it that word, but you have a pass/fail, don't you?
>
> A. There's a positive and a negative response.
>
> Q. Okay. And what do you call it when they fail?
>
> A. There is no failure. There's a positive response or there's a negative response.
>
> . . . .
>
> Q. Am I telling you the truth and that most everybody fails it?
>
> A. No, absolutely not. LSU did a study of our functional capacity evals. Dr. Matheson says about three percent of the people in the workers' comp are Type II symptom magnifiers. We found that 1.8 percent of the people we evaluate are Type II symptom magnifiers.

Mr. Fontana further explained that the behavior questionnaire on its own, means nothing. They look for nonphysiologicals during the remainder of the examination as well.

20

Although Ms. Joseph's counsel attempts to make the Fontana FCE appear biased, after reading the explanations provided by Mr. Fontana at the hearing, we disagree. After a review of the record, we find no error in the trial court's decision to admit and consider the Fontana FCE.

**DECREE:**

For the foregoing reasons, the November 4, 2021 Judgment of the Workers' Compensation Court is affirmed. All costs of this appeal are assessed against Appellant, Carol Joseph.

**AFFIRMED.**